ORLEY JEFFERSON MAYFIELD, Administrator of the Estate of BENJAMIN LOGAN MAYFIELD, v. KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant.—85 S. W. (2d) 116.

Division One, July 9, 1935.

*Cyrus Crane, Geo. J. Mersereau* and *Dean Wood* for appellant.

*Madden, Freeman & Madden* for respondent.

HYDE, C.—This case, coming recently to the writer, is an action for damages under the wrongful death statute.  The action was brought by an administrator for the benefit of the next of kin of the deceased, Benjamin Logan Mayfield.  The petition contained charges of both primary and humanitarian negligence.  The jury

returned a verdict for the plaintiff for $10,000 and from the judgment entered thereon defendant has appealed.

■ Defendant contends that its demurrer to the evidence, at the close of the case, should have been sustained because plaintiff failed to make a case for the jury of either primary or humanitarian negligence. Since on ruling this question, plaintiff is entitled to have the evidence considered from the viewpoint most favorable to him and to have all reasonable inferences, from the facts shown, drawn in his favor, our statement of facts will be made on that basis. [Hardin v. Illinois Central Railroad Co., 334 Mo. 1169, 70 S. W. (2d) 1075, and cases cited.] So considering the evidence, we find that it tends to show that Benjamin Logan Mayfield was a special agent of the Burlington Railway whose duties required him to be at night in its Twelfth Street yards in Kansas City. Mayfield was killed there about one-fifteen A. M., on July 8, 1929, by a transfer movement of defendant, Kansas City Southern Railway Company. These yards mentioned extend in a northerly and southerly direction between Twelfth and Sixteenth streets, and consisted of a series of six tracks numbered from two to seven, inclusive. On the night in question a Burlington train, No. 75, consisting of an engine, a car and a caboose, in the order named, entered the yards from the north and proceeded southward on track five, closely followed at an interval estimated variously at forty to fifty feet (Daume, Burlington brakeman), sixty to eighty feet (Organ, Burlington switch foreman), and about 125 feet (Roberts, defendant's switchman), by a transfer movement of the Kansas City Southern consisting of two cars and an engine. The engine on Burlington train No. 75 was on the south pulling the car and the caboose, the latter being on the north or rear end. This caboose was lighted at the rear or north end by the cupola light, by two side markers and a white lantern, and the interior was also lighted, with the rear door open, so that the light therefrom shone northward onto the track. Defendant's transfer, following this lighted caboose, consisted of two refrigerator cars on the south shoved by the engine on the north, so that a Southern freight car was immediately behind and following the caboose. Both movements were proceeding at a speed estimated at from three, or four to six miles per hour. Defendant's engine was "drifting," i. e., proceeding with the power off, and made no noise to indicate its approach.

Defendant's locomotive pushing the two large refrigerator cars, each fifteen feet high and forty feet long, came behind Burlington train No. 75 only a few blocks before reaching the yards. Defendant's crew, consisting of an engineer and a fireman, switch foreman and two switchmen, had brought these refrigerator cars from the Southern yards which lay north of the Burlington exchange yard. The movement of these trains down track five was customary and

in the usual course of business in those yards. The night was dark, without a moon, but clear. There were no permanent lights in the Burlington yards. On track four, the next track to the east of said track five, there was another Burlington train, No. 83, of about twenty freight cars which had been pulled in from . the south or Sixteenth Street end of said track. These twenty cars were on track four when the Burlington train, and the Southern transfer following it, came down south on track five. The Burlington train No. 75 stopped a few feet south of the south end of these freight cars on track four. Organ, a Burlington switch foreman, was standing three or four car lengths north of this point between tracks four and five when the two trains came down track five and passed him.

According to plaintiff's evidence, Roberts, one of the Southern switchmen, was sitting on the west side of the south or last refrigerator car (the engineer's side of the train), about eight or nine feet from the end, with his lantern lighted and placed on his right side and Johnson, the Southern switch foreman, was sitting a few feet away between him and the end of the car without any lantern lighted. There was no evidence that any of the Southern employees saw anybody on or approaching the track, except the testimony of Roberts. The Burlington brakeman, Daume, testified that, practically all the time Burlington train No. 75 was proceeding south on track five ahead of the Southern cars, he was standing on the rear platform of the caboose with the door open behind him leading into its lighted interior; that while he did not keep his eyes on the following Southern cars, he was out there to watch them and make sure they did not run into his train. He did not notice anyone on or near the track. He said that he could not see defendant's transfer after it came alongside train No. 83, which was standing on track four. The Southern transfer stopped within ten or fifteen feet of the caboose on the Burlington train ahead of them.

According to Roberts, when the two movements were midway in the yards, a man stepped from the east onto track five, immediately behind the lighted Burlington caboose. Robert's testimony was as follows:

"I saw a man standing there just as the caboose went by. He had a light in his hand. It was a flash light and I saw it flash. . . . He just stepped over on the track. Just when I saw him he stepped on the track. . . . It looked like he was flashing it on the ground. I didn't see him but about . ten seconds; maybe not that long; just at a glance I saw it flash. . . . Just a second or two. . . . I couldn't see so awfully plain, but I knew it was a man. . . . I glanced up there and saw him. I supposed he would get away. . . . I just glanced up and saw him and looked away. . . . I saw him and glanced back west."

Roberts also said that thereafter he felt the car run over something and "remarked about it to Johnson." He said "it felt like we might have run over a piece of wood, a big piece of wood. It made the car rock. . . . It was just about where I seen that man."

Mayfield's body was found after defendant's engine was detached and backed away from the cars it brought in. Organ, who was checking the cars of Burlington train No. 83, discovered the body about the same time it was seen by defendant's crew. The Burlington men, who were plaintiff's witnesses, testified that there was no light on the end of the lead car of defendant's transfer. An investigation of the wheels of both engines and the cars showed that the Burlington train had not run over anyone but that defendant's transfer had. Walsh, a Burlington car inspector, said that he was inspecting train No. 83 when train No. 75 passed him; that he crossed behind No. 75 not seeing defendant's transfer, but just as he got across heard its brakes grinding behind him, turned and saw it; that before he crossed he had already worked to the southern end of the train he was inspecting; that he crossed to inspect No. 75; and that a short time before he had finished with train No. 83 he passed Mayfield, who was looking at stock in that train. Defendant's evidence was that there were lights on the front of the lead car of the transfer; that both Johnson and Roberts were there keeping a lookout; that Johnson's light was on; that Roberts was later discharged; and that he had previously been discharged by the Missouri Pacific. Defendant says in its brief: "The customs of lookout and lights were undisputed facts in this case under the evidence in the record. The witnesses of both parties agreed without contradiction on the existence of these customs, and it was whether the customs were violated or not that was contested."

We think that this evidence justified a finding that, almost immediately after Roberts saw Mayfield, he was in a position of imminent peril. The distance at which Roberts saw Mayfield was, of course, something less than the interval between the two movements, since he stepped onto the track after the caboose had passed. The estimates, made by plaintiff's witnesses, of this intervening distance between the movements varied from forty to fifty feet (Daume), and sixty to eighty feet, about a car length and a half (Organ), to 125 feet, about three car lengths (Roberts). Defendant's fireman said they were only one or two car lengths apart. The distances given by all of these witnesses were only estimates, and not exact, and the jury could reach its own conclusions therefrom by determining which was in a better position to judge distance. When Mayfield was seen to step upon the track the jury might reasonably find that he could not see or hear the transfer, if it was unlighted and drifting in noiselessly; that he was, therefore, oblivious thereto; and that if he was oblivious, he was in imminent peril if he did not immediately

step off. After seeing him, or being able to see him, upon the track at such distance as the jury could find he was, and under those circumstances, they could reasonably find that the duty arose under the humanitarian rule to observe whether he did immediately step off and if he did not to warn him or by other means at hand to prevent running over him.

The jury might also find that defendant's crew on this transfer, although concealed by the darkness from the view of Mayfield, were not themselves prevented from discovering him. Since they could find that he stepped into the light shining from the caboose, and was between appellant's crew and the lighted caboose, they might reasonably believe he was visible against that lighted background. Roberts said that he saw a man standing there, as the caboose went by, when he flashed his light; that he was flashing it on the ground; that he saw him step on the track; that he glanced away; and that he felt the car run over something just about the place where he had seen the man. During whatever time Roberts saw him, the distance was constantly decreasing between him and the approaching movement; and the jury could have found that Roberts did not cease to see him because of darkness but because he voluntarily glanced away. If the jury believed that Roberts did see Mayfield, they could, of course, have found that Johnson, who was sitting on the car in front of Roberts, according to his testimony, could have seen him if he had been looking. They could have found the distance that Mayfield then was from the movement to be anywhere between 40 and 125 feet. Under all the evidence, the movement could have been stopped in from ten to fifteen feet (Johnson said 3 to 6 feet) and Mayfield could have been warned in even less time than it would have required to stop.

Appellant argues that Roberts may have seen Walsh, rather than Mayfield. This is an argument which could be made to the jury, but they could reasonably have found that it was Mayfield, since there was evidence tending to show that Walsh crossed south of the place where defendant's transfer stopped, and that the point, where the man stepped upon the track, who was seen by Roberts, was over 300 feet distant from the point where Walsh went across the track. Mayfield's body was not found at the point where Walsh said he crossed and a flashlight was found by the body. We hold that plaintiff made a case for the jury upon the charge of humanitarian negligence.

The demurrer to the evidence was also properly overruled because plaintiff made a submissible case of primary negligence. Defendant argues that Mayfield was guilty of contributory negligence as a matter of law in going on the track and standing there until he was run over. As above shown, how long he was on the track was a matter, which reasonable men might reach different conclu-

sions about, because of different estimates of the distance the transfer was from him and how fast it was approaching when he went on the track. There is no dispute about its being the custom to have a light on the lead car of a transfer coming into these yards from another railroad. If Mayfield stepped on the track, unable to see or hear the transfer, knowing that it was required of any transfer movement, which might follow the caboose, to display such a light and knowing that it was against the rules to have any switching movement following the road train, then it was, at least, for the jury to say whether under such circumstances he was on the track long enough to be convicted of contributory negligence. Of course, there was sufficient showing to make a jury question as to whether the violation of the custom as to the light or as to the lookout was the proximate cause of Mayfield's death.

Defendant's next contention is that the case was not properly submitted under plaintiff's Instruction 1, authorizing a verdict upon negligence under the humanitarian doctrine. Plaintiff's petition alleged primary negligence, in the violation of rules or customs, which was stated in the petition, as follows:

"It was and for a long time prior thereto had been the custom, practice and rule of defendant and other railroad companies in switching or moving cars over tracks in railroad yards in Kansas City, Missouri, in the nighttime *to have a lighted lantern on the end of the lead car* in the direction of movement placed or held in a position to be visible to persons on or near said track and to have a trainman riding on the front end of the lead car in a position to warn persons on or near said track and give signals to the engine crew. . . . And in the nighttime on the date aforesaid, defendant through and by a switching crew acting as the servants, agents and employees of defendant, operated an engine and several cars south on track No. 5 in said railroad yards in the vicinity of Twelfth and Mulberry streets and that the engine was on the north end of said movement shoving said cars and *the lead car was not provided with a lighted lantern or other light on the front end thereof* placed or held in a position to be visible to persons on or near the tracks and that said movement was being made without a member of the train crew on the front end of the lead car in a position to warn persons on or near said track and to give signals to the engine crew and that as said movement was progressing south Benjamin Logan Mayfield, in the course of his employment, had occasion to be and was upon said track number five and the defendant and its employees in charge of said engine and cars negligently caused or permitted the same to run upon and collide with said Benjamin Logan Mayfield." (Our italics.)

In addition to this charge of negligence, plaintiff made a charge of negligence under the humanitarian doctrine which repeated most

of the above statements in regard to the violation of the customs as stated above in the charge of primary negligence. Plaintiff submitted his case upon Instruction No. 1, which after stating facts as to age, dependents, etc., continued, as follows:

''And if you further believe and find from the evidence that at the time in question on July 8, 1929, defendant operated the transfer movement mentioned in evidence southward upon track 5 mentioned in evidence in said yards mentioned in evidence, following the said Burlington train mentioned in evidence (if so); and that said transfer movement so operated by defendant (if so) consisted of a locomotive and a train of two cars, said cars being shoved in said movement by the said engine or locomotive on the north end thereof (if you so find); and if you further believe and find from the evidence that, as said movement proceeded southward upon the said track 5 (if you find it did), the said Benjamin Logan Mayfield in the discharge of his duties under the said employment as aforesaid (if so) had occasion to be and was upon said track 5 ahead and to the south of the said cars and locomotive (if so); and if you further believe and find from the evidence that at said time and for a long time theretofore (if so) it had been and was the custom and practice of defendant and other railroad companies in moving cars over the tracks, including said track 5 (if so), in said yards in such transfer movements by night to have a lighted lantern on the end of the lead car in the direction of movement placed or held in a position to be visible to persons on or near the track (if you so find) and to have a trainman riding on the front end of said lead car in a position to warn persons on or near the track and give signals to the engine crew (if you so find); and if you further believe and find from the evidence that at said time and for a long time theretofore (if so) it had been and was the custom and practice of special officers and other pedestrians mentioned in evidence to walk on and across said tracks in said yards, including said track 5 (if so), both by day and by night (if so), and that at said time and for a long time theretofore (if so) it was and had been the custom and *practice of said special officers by night to rely and depend upon said lights being so displayed* by such transfer movements, and if you further believe and find from the evidence that in the movement of cars in question in said yards (if so) and as said movement approached the point of collision with the said Mayfield (if you find it did), *the lead car thereof was not provided with a lighted lantern or other light on the front end thereof* placed or held in a position to be visible to persons on or near said track (if so) and that said movement was so made at said time and place without a member of the train crew on the front end of the lead car in a position to warn persons on or near said track and give signals to the engine crew (if so); and if you further believe and find from the evidence

that at said time and place (if so) defendant through its agents, servants and employees in charge of said movement knew or in the exercise of ordinary care could have known of the customs and practices (if any) aforesaid of said defendant and other railroad companies and that said movement was *thus being made without said light* as aforesaid and without said member of the crew in the position aforesaid upon said lead car (if you find it was) and that said movement so made (if so) was contrary to said customs and practices (if you find it was); and if you further believe and find from the evidence that at said time and place defendant through its agents, servants, and employees in charge of said movement knew or in the exercise of ordinary care could have known of the custom and practice (if any) aforesaid of special officers and other pedestrians being along and upon said tracks in said yard, including said track 5 (if so), by night and by day, and of the said custom and practice (if any) of said special officers *to rely upon a light being displayed* at night as aforesaid in such movements of cars; and if you further believe and find from the evidence that as said movement so operated by defendant approached the point of collision (if any) with the said Mayfield (if you find it did) the said Mayfield was upon the said track 5 and was in a position of imminent peril (if so) of being struck by the said movement and was oblivious thereto; and that defendant at said time and place (if so) knew or in the exercise of ordinary care could have known of said Mayfield's said position upon said track (if you find he was so upon said track) and of his said position of imminent peril of being struck by said movement (if you find he was in such position) and of his obliviousness thereto (if you find he was so oblivious) in such time (if so) that thereafter (if so) said defendant could be in the exercise of ordinary care, with the means at hand and with safety to the persons upon said movement (if so), have stopped said movement or given a warning signal thereof (if so) and thereby (if you so find) could have avoided and prevented said movement and cars running upon and over the said Mayfield (if so), but that said defendant failed so to do, and that in so failing (if you find it did) said defendant was negligent; and if you further believe and find from the evidence that as a direct result (if so) of such negligence (if any) the said Mayfield was injured and killed, then you will return a verdict in favor of the plaintiff and against the defendant; and this you will do, if you find the foregoing, even though you should find the said Mayfield was negligent in entering, being, or remaining in the position of peril (if any) aforesaid." (Our italics.)

This instruction is clearly erroneous as a humanitarian submission. No jury could ever be expected to "unscramble" the matters of primary negligence, therein hypothesized, from the acts which would constitute humanitarian negligence. Comparison with the

petition makes it apparent that it allowed them to find for plaintiff upon any of the primary negligence charged, and then eliminated contributory negligence as a defense to such primary negligence. It could mean to a jury that, if they believed that Mayfield would not have been killed if "the lead car" had been "provided with a lighted lantern or other light on the front end thereof placed or held in a position to be visible to persons on or near the track," they could find for plaintiff, regardless of the issue of contributory negligence or the requirements of the humanitarian doctrine. Such an interpretation would not only be in accordance with the wording of this long, involved instruction, but it was, in effect, made to the jury, as shown by the following excerpts, from the argument of plaintiff's counsel, namely:

"The only issue, therefore, *is this—Was that an unlighted movement*, without a lookout, that night *when it reached the point where it killed that man?* . . . Is there any question in your mind but what those men were telling the truth when they testified that that movement of the Southern came down that track, where they knew men must be working, *without a light,* without a lookout, and without a warning? . . . Was this man bound to anticipate, as he glanced up there that night and *saw no light, that the defendant would send down an unlighted, unwarned movement, without signaling* to those who it knew were then working around that track? Was he bound to anticipate that? Maxwell says, 'No,' and everyone of the other witnesses says 'No,' because *they do not want unlighted movements down the track* under those circumstances. . . . *This evidence shows no bell, no light, no lookout, and no warning* of any kind—that is admitted—and, under the circumstances, can there be any question of liability? Where was the negligence—on the car or on the track? *If it was negligence* on the car, *as to the light, there can be no bar to a recovery* in this action." (Our italics.)

It is prejudicial error, in an instruction submitting humanitarian negligence, to inject therein primary negligence of the defendant or contributory negligence of the plaintiff; to require consideration of any antecedent negligence of either plaintiff or defendant which existed prior to the time that the humanitarian doctrine properly commenced to operate; or to predicate recovery upon any different facts than those which actually existed at the time the peril arose and was discovered, or, if there was a duty to keep a lookout, when it was discoverable by the exercise of the required degree of care. [Henson v. St. L.-S. F. Railroad Co., 301 Mo. 415, 256 S. W. 771; State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. (2d) 798; Alexander v. St. L.-S. F. Railroad Co., 327 Mo. 1012, 38 S. W. (2d) 1023; Sevedge v. K. C., St. L., C. Railroad Co., 331 Mo. 312, 53 S. W. (2d) 284; Millhouser v. K. C. Public Serv-

ice Co., 331 Mo. 933, 55 S. W. (2d) 673; Freeman v. Berberich, 332 Mo. 831, 60 S. W. (2d) 393; Larey v. M.-K.-T. Railroad Co., 333 Mo. 949, 64 S. W. (2d) 681; Wholf v. K. C., C. C. & St. J. Railroad Co., 335 Mo. 520, 73 S. W. (2d) 195; Taylor v. Superior Oxy-Acetylene Co., 335 Mo. 379, 73 S. W. (2d) 186; Brown v. Wheelock, 83 S. W. (2d) 911.] It would seem that the only exception to this would be that, under some circumstances, a failure to give warning signals of approach might be properly considered either under a primary or humanitarian negligence charge. A charge that failure to keep a lookout is the proximate cause of an injury, whether the duty to look arises either because of the place or because of the circumstances, is a charge of primary negligence, but it is not humanitarian negligence. However, a failure to keep a lookout, *at a place where there is a duty to do so,* is not, under our Missouri humanitarian rule, any excuse for failing to prevent injury to one whose peril could have been discovered in time to prevent his injury if such a lookout had been kept. In other words, in spite of a failure to keep a lookout the humanitarian doctrine may come into operation, not because that is in itself humanitarian negligence, but because we have, *at places where there is a duty to keep a lookout,* extended the humanitarian rule to discoverable as well as discovered peril. [Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482.] A consideration of our decisions will show that the places referred to as places where there is a duty to be on the lookout so as to make the humanitarian doctrine applicable to discoverable peril, are either public places, or in the nature of public places because they are frequented and used by many people. It may, therefore, be proper to submit to the jury, in appropriate language, the question of whether there was a duty to keep a lookout at the place of the accident (because of its use or the kind of place it is but not at any place merely because of the circumstances of the particular occasion) and to tell them that, if they so find, then they may find for a plaintiff, injured at such place, if they believe that defendant in the exercise of ordinary care could have seen him in imminent peril, as well as if defendant did see him.

We have extended the doctrine further than many other states in considering discoverable peril at all. The doctrine originally was based upon actual superior knowledge by the defendant of a plaintiff's peril, from which a duty of care arose, and it therefore applied only to actually discovered peril. [20 R. C. L. 138-144, secs. 114-117; 45 C. J. 984-993, secs. 539-544; 92 A. L. R. 47, note; Davies v. Mann, 19 Eng. Rul. Cas. 190; 152 Eng. Reprint, 588, 10 M. & W. 548.] Although we have thus greatly widened the field of its application, we have not included peril not actually discovered, unless the place of the accident was a place where the operator of the instrumentality was, at all times he approached it, under a legal duty

to keep a lookout. In the case of automobiles operating upon public streets and highways, the operator has imposed upon him the continuous statutory duty to exercise the highest degree of care at all times and all places thereon to keep a lookout for persons thereon and in every other respect. [Gude v. Weick Bros. Undertaking Co., 322 Mo. 778, 16 S. W. (2d) 59; Hart v. Weber (Mo.), 53 S. W. (2d) 914; Kaley v. Huntley, 333 Mo. 771, 63 S. W. (2d) 21.] In the case of railroads there is, likewise, a continuing obligation, which does not arise from the circumstances or conditions of the particular occasion, on the part of those operating trains or cars to keep a lookout at all places where they come upon or cross over public streets or highways. It is not necessary to require the jury to find the existence of a duty to keep a lookout at such places on the part of operators of automobiles or railroad trains, because there is, no question about it, and the court can tell them that at such places they may find for plaintiff if his peril could have been discovered by the exercise of the degree of care required of the defendant. We have gone even further and held that there is also a duty to keep a lookout at places where a railroad company has permitted such public use of its tracks, as a pathway or crossing, that the presence of persons there should reasonably be anticipated by it, on the theory that such user has given the place something of the nature of a public street crossing, and that the railroad has, by permitting it, waived its right to a clear track there. Since the question of whether there was such a user as to require a duty to keep a lookout for persons on the track, at any particular place, is a question of fact, it is necessary to require the jury to find sufficient user to create this duty there before the humanitarian doctrine can be applied to discoverable peril at this particular place. (Or before there can be a cause of action for primary negligence for failure to keep a lookout there.) [Wise v. C., R. I. & P. Railroad Co., 335 Mo. 1168, 76 S. W. (2d) 118; Crossno v. Terminal Railroad Assn., 41 S. W. (2d) 796, 333 Mo. 733, 62 S. W. (2d) 1092; Savage v. C., R. I. & P. Railroad Co., 328 Mo. 44, 40 S. W. (2d) 628; Stergon v. St. L.-S. F. Railroad Co. (Mo. App.), 286 S. W. 720; Ahnefeld v. Wabash Railroad Co., 212 Mo. 280, 111 S. W. 95; Eppstein v. Missouri Pacific Railroad Co., 197 Mo. 720, 94 S. W. 967.] However, if there was such user, the applicability of the humanitarian rule to discoverable peril at the place does not depend upon whether the engineer was actually looking, or whether the train had lights, or whether its bell was working. The duty becomes a continuous duty to keep a lookout every time the place is approached, regardless of the circumstances of the particular occasion, and they have nothing to do with determining whether there is humanitarian negligence in injuring someone who could have been seen but is run over at such place without being seen. If there

was a duty to keep a lookout the question is could he have been seen in time if it had been kept, and not was a lookout kept.

Plaintiff argues that, because in this case, defendant, by reason of its rule or custom, owed a duty to Mayfield to have a man with a lighted lantern on the end of the front car of such a transfer, there would also arise the duty to keep a lookout for him if it violated its other duty to have a light by which he could see the car coming and keep out of its way. While that may be true, such duty as to lookout would be a duty, the violation of which would create a cause of action for primary and not humanitarian negligence. [See Savage v. C., R. I. & P. Railroad Co., supra, and cases cited.] The fact that, under such circumstances, there would be a cause of action for primary negligence, does not give the failure to have a light a place in a humanitarian submission, because that duty as to lookout arises out of the circumstances of that particular occasion only. Defendant's failure to perform its duty, as to having the lighted lantern on the car so that a trackman could see it coming and get out of its way, would also of itself give a cause of action to any trackman injured by reason of such failure. But his cause of action, based upon such a failure, would be an action for primary negligence and would have nothing to do with negligence under the humanitarian rule. The only custom that could give the right to include discoverable as well as discovered peril, under such circumstances as were shown here, would a custom or rule that required all such movements to keep a lookout at this place every time they were made. We cannot, without wiping out all distinction between humanitarian and primary negligence, further extend our already far extended humanitarian rule to make it cover discoverable peril, merely by showing circumstances from which there would arise a duty to be on the lookout at that particular time or on that particular movement only. The violation of such a duty is primary negligence only, as it does not show a continuing duty to be on the lookout at the location of the accident at all times it is approached which is essential to create the duty, to keep a lookout, necessary to bring the humanitarian rule into operation as to merely discoverable peril.

It has long been held that as to a person walking on the track, at a place where there has not been such user as creates the duty to keep a lookout, the railroad is "entitled to expect a clear track;" that they "owed . . . no duty to look out for" a person thereon; and that one, run over at such a place "must show that he was *actually seen* by the engineer in time to have warned him and thus avoided his injury." [Frye v. St. L., I. M. & S. Ry. Co., 200 Mo. 377, 98 S. W. 566, 8 L. R. A. (N. S.) 1069; Crossno v. Terminal Railroad Assn., 333 Mo. 733, 62 S. W. (2d) 1092, and cases cited.] As to a railroad employee, who is working in its

yards, the rule is similar; that is, under usual conditions, there is no liability under the humanitarian rule "unless he was *'actually seen'* by its operatives in a position of peril in time, by ordinary care, to stop the train and avoid the injury." [Rashall v. St. L., I. M. & S. Railroad Co., 249 Mo. 509, 155 S. W. 426; Degonia v. St. L., I. M. & S. Railroad Co., 224 Mo. 564, 123 S. W. 807.] This is because switchmen and other employees working anywhere in and about railroad yards are under the duty of looking out for themselves in the absence of a rule or custom to the contrary. [Goodwin v. Missouri Pacific Railroad Co., 335 Mo. 398, 72 S. W. (2d) 988, and cases cited.] It would, therefore, be proper in the submission of humanitarian negligence, in this case, to require the jury to find the existence of a custom or rule to always keep a lookout, for the yard employees, upon every transfer coming from another railroad, into these yards (if it was not admitted and plaintiff here says it is admitted), and to tell them that, if they found that there was such a custom or rule, then they could find for plaintiff if defendant in the exercise of ordinary care could have discovered Mayfield in imminent peril in time thereafter to have prevented his death. Even then the question would not be whether defendant on this occasion violated the rule or custom as to lookout, but whether under the circumstances shown, defendant's employees could have, in the exercise of ordinary care, discovered Mayfield in imminent peril in time to have prevented striking him by warning or stopping under then existing conditions, with the means then available. Whether there was a light on the car perhaps had some bearing on the question of Mayfield's obliviousness, but as to creating a duty to have a lookout or as a basis of finding humanitarian negligence in failing to discover Mayfield on the track, whether or not there was a rule or custom to have a light on the car, or whether or not it was violated on that occasion, had no place whatever in the instruction.

This instruction was, therefore, completely misleading and prejudically erroneous. Since there must be a new trial in this case, because of this erroneous instruction, it is not necessary to consider further assignments of error.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.,* not sitting.