Martin J. McDONOUGH, Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant.

No. 48360.

Supreme Court of Missouri,

Division No. 1.

Nov. 13, 1961.

Donald W. Bird, St. Louis, for appellant.

Mark D. Eagleton, St. Louis, for respondent.

Joseph Nessenfeld, St. Louis, of counsel.

HOUSER, Commissioner.

Action for personal injuries sustained by Martin J. McDonough, a motorcycle policeman, when the three-wheeled motorcycle (tri-car) he was driving and a St. Louis Public Service Company bus collided in the intersection of 12th Street and Washington Avenue in downtown St. Louis. A jury trial resulted in a verdict for plaintiff for $20,000. Defendant has appealed from the ensuing judgment.

Washington Avenue and 12th Street are principal public thoroughfares in downtown St. Louis. Both are level, paved streets. Washington runs east-west; 12th Street runs north-south. They intersect at right angles. Traffic is regulated by electric lights standing on all four corners of the intersection. The sequence is go (green), caution (amber), stop (red). When the lights are red for east-west traffic they are green for north-south traffic, and vice versa. There are eight traffic lanes in 12th Street, designated by white painted lines; four for northbound and four for southbound traffic. Twelfth Street immediately north of Washington is 44 feet 1 inch from the east curb line to the painted center line; 41 feet 7 inches from the painted center line to the west curb (total width, 85 feet 8 inches). There are six traffic lanes in Washington, which is 50.5 feet wide east of 12th Street, and 56 feet wide west of 12th Street. Sidewalks on these two streets are 10 or 12 feet wide. There are 12-foot white-painted crosswalks on all four segments of the intersection. The south line of the crosswalk along the north segment coincides with the north curb line of 12th Street, extended.

On August 8, 1958 between 5 and 5:15 p. m., on a bright, clear, dry day, plaintiff was driving his tri-car south on 12th, intending to turn west on Washington. Defendant's bus was proceeding west on Washington, heading for the bus loading zone on the north side of Washington just west of 12th. The vehicles collided in the northwest corner of the northwest quadrant of the intersection while plaintiff was executing a right turn.

Plaintiff's petition contained both primary and humanitarian assignments of negligence, but the case was submitted to the jury solely on failure "to have swerved said motorbus and to have given a timely and adequate warning of the approach and proximity of the bus," under the humanitarian doctrine.

On this appeal defendant asserts error in overruling its motion for a directed verdict on the ground that plaintiff did not

make a submissible case of humanitarian negligence on either failure to swerve or failure to warn; error in giving Instructions Nos. 1 and 6; misconduct of a juror; improper final argument and excessiveness of the verdict.

Plaintiff contends that the negligence submitted was a combination of defendant's failures to both swerve and warn, "a single compound form of negligence," but further argues that there was substantial evidence that defendant's operator could have avoided the collision after peril was discoverable "*either* by swerving alone *or* by sounding a warning alone"; that considering plaintiff's obliviousness, there was "ample time within which the operator could have reacted and then taken *either or both* of the precautionary measures submitted," but that, in any event, the combination of such measures, as submitted, would have averted the collision. We will first consider whether plaintiff made a case of failure to warn under the humanitarian doctrine.

From the testimony of plaintiff, his two witnesses and a plat drawn to scale the following facts were made to appear: Plaintiff, driving his tri-car south in the westernmost lane of 12th, next to the curb, intending to turn west on Washington, stopped for a red light against southbound traffic. The tri-car stopped 2 or 3 feet north of the north line of the crosswalk. Counting the width of the crosswalk, the distance between the tri-car and the north curb line (extended) of Washington was 14 or 15 feet. Traffic was heavy. Immediately to plaintiff's left there were three lanes of solid traffic—southbound automobiles stopped, waiting for the traffic light to change. The front of plaintiff's tri-car was even with the back of the hood of the car to his left. Plaintiff could see to the east over the hood of the adjacent car only as far as the center of 12th Street. His view was cut in half by the traffic in the other lanes to the east, which were slightly ("as much as half a car length") ahead of him. When the light changed from red to green plaintiff looked to the east as far as the middle of 12th Street. He saw nothing in that space. After waiting for two pedestrians to clear the crosswalk in front of him plaintiff moved forward, intending to go west on Washington. After he started forward plaintiff made no attempt to look to the left, before or during the right turn, at any time before the collision occurred. All the rest of the time the tri-car was in motion plaintiff was watching the right curb lane, with his head turned to the right or west, looking to the right. At no time did plaintiff ever see the bus prior to the collision, and he did not apply the brake. As he reached the north curb line of Washington he had attained a speed of 5–7 m. p. h. Plaintiff could stop his tri-car within a total distance of 5–7 feet, traveling at 5–7 m. p. h. under the existing conditions. As he moved forward the three lanes of traffic to his left also moved forward, plaintiff's tri-car maintaining its same relative position to the automobiles as they all moved south on the green light. Plaintiff rounded the corner, maintaining a distance of approximately 2 feet between his right rear wheel and the curb. The curb was a curve, not a right angle. As the tri-car was making the turn, 2 feet from the curb, just after the tri-car entered the intersection, its front wheel and fender collided with the right side of the westbound bus. The impact occurred while plaintiff was in the space between the painted lines of the two crosswalks which converged at the northwest corner of the intersection, 2 feet west of the west curb line (extended) of 12th Street, with the right rear wheel of the tri-car about 2 feet from the north curb line (extended) of Washington. The tri-car was headed southwest. Plaintiff was looking to his right, watching pedestrians.

The bus was 40 feet long, 10 feet wide, and 9 feet high. The point of collision on the bus was on the right side, between the front and rear doors. The impact somersaulted plaintiff off the tri-car and onto the pavement, inflicting injuries. No horn was sounded by the bus driver before the collision.

Plaintiff's witness Doyle, driving a car behind plaintiff in plaintiff's lane, testified as follows: 2, 3 or 4 seconds after the light for southbound traffic turned green, after pedestrians left the crosswalk in front of him, plaintiff proceeded forward through the crosswalk and started making a right turn. Asked for an "estimate" of the "approximate" speed of the bus Doyle answered "It was going thirty miles an hour, at least." Doyle first saw the bus when "it had just passed the center of the intersection"; when the bus was 3 or 4 feet west of the center line of 12th Street. The bus was headed at a slight angle to the northwest, with its right front corner about 2 feet farther north than its right rear corner. When Doyle first saw the bus the tri-car was even with the north curb line of Washington. There was no westbound traffic on Washington other than the bus at that time. When Doyle first saw the bus, Doyle stopped. The front of Doyle's car, thus stopped, occupied more than half of the width of the crosswalk. The bus "seemed to be missing the center lanes of traffic * * * the bus was on an angle around those lanes of traffic * * * heading at a diagonal towards the curb * * * at the northwest corner." The southbound traffic in the center lane and the next lane were out in the intersection when he first saw the bus. They came to a stop and let the bus go through. This traffic stopped about a foot from the right side of the bus. When Doyle saw the bus the tri-car was "on an angle, headed west on Washington." It had "almost completed its turn," and was "just hardly moving." Doyle said that the tri-car had "almost completed" the turn into Washington at the time of the collision. The collision occurred "right behind the front door" of the bus.

Plaintiff's witness Moore, a traffic officer stationed in the safety zone on Washington just west of 12th, did not see the collision, but heard the noise of the impact, looked toward the sound and saw the bus traveling west on Washington at 10–12 m. p. h.

The bus driver, three passengers and a pedestrian testified for defendant. The bus driver testified that he entered the intersection on a green light and had to stop on account of traffic ahead of him; that while waiting for that traffic to clear the light turned yellow. The bus was then 15–20 feet west of the east curb line of 12th Street. When the traffic cleared the bus proceeded across the intersection. It is clear from his testimony that the two lanes of southbound traffic "started to move up" before he saw plaintiff sitting on the tri-car. With his "eye on that traffic there" the bus driver "noticed the motorcycle officer parked at the curb, and the other traffic had started to move up to the crosswalk, the other two lanes of traffic, * * *." Plaintiff was then looking over his shoulder, talking and laughing with the newsboy, according to the bus driver. The newsboy, called as a witness, did not confirm this. The bus was in the center of 12th Street when the bus driver "took notice of this motorcycle for the very first time." The two southbound lanes of traffic, which had started to move up when the red light went against the bus, advanced 8 or 10 feet into the crosswalk, and there stopped to permit the bus to pass in front of them. The bus driver watched plaintiff as far as he could see him "out of the side of" his eye, but claimed he did not see the tri-car start in motion at any time, and admitted that he did not sound a horn at any time. The front of the bus was 15 feet west of the west curb line of 12th Street when the collision occurred—it had "already crossed the crosswalk." He estimated the maximum speed of the bus in the intersection at 10 m. p. h.; stated that he began slowing down and was going 8 m. p. h. when the bus was about 15 feet east of the west curb of 12th Street, and judged that the bus was traveling around 5–6 m. p. h. at the time of impact.

Pedestrian Ford testified that she saw plaintiff sitting on his motorcycle in the southbound curb lane, and saw the west-

bound bus as it was crossing 12th Street in the westbound curb lane on the green light, going "about medium or normal" speed; that when the motorcycle began to move forward the front end of the bus was west of the west curb line of 12th Street, "half way clear of 12th Street"; that none of the other southbound traffic on 12th Street started forward when plaintiff did; that plaintiff's motorcycle collided with the back part of the right side of the bus, and that plaintiff was looking west—had his head turned to the west—all the time he was moving.

None of the bus passengers confirmed the bus driver's statement that the bus stopped for traffic after entering the intersection and none of them could fix the position of the bus with any degree of certainty at the time plaintiff's tri-car started to move south, or at any time in relation to the position of the tri-car. Passenger Betz testified that the bus was traveling about 15 m. p. h., "at normal driving speed," as it entered the intersection on the green light; that it did not slow as it entered the intersection, and proceeded across without hesitating or stopping; that the bus was beginning to slow for the bus zone west of 12th Street when the impact occurred. Passenger Bufalo testified that she noticed the traffic light turn amber for westbound traffic, and then looked and saw plaintiff; that when she first saw plaintiff on his motorcycle he was in a stopped position; that she saw plaintiff's motorcycle start in motion; that the bus was "into 12th Street" when the motorcycle started; that plaintiff moved forward before the other southbound traffic moved; that plaintiff's head was turned to the west, and that, judging from the noise, the bus was "a few feet" from the northwest corner when the collision took place. Passenger Scott testified that when he first saw him, plaintiff was stopped, north of the crosswalk; that plaintiff was facing west; that plaintiff "pulled up and ran right into the side of the bus."

■ Whether plaintiff made a submissible humanitarian case depends upon wheth-er the evidence, considered in the light most favorable to the plaintiff, Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47, 50[1, 2], shows that the bus driver in the exercise of the highest degree of care, with safety to himself and others and the bus, had the ability to avoid the collision by swerving and warning after plaintiff came into a position of imminent peril. The immediate and decisive questions are when and where plaintiff came into a position of peril, and whether thereafter the bus driver could have averted the collision by swerving and warning. All the evidence indicates that plaintiff was oblivious at all times during the forward progress of the tri-car, and that the jury reasonably could have found that defendant's bus driver knew, or should have known, thereof. Plaintiff's obliviousness widened the zone of peril considerably beyond the immediate path of the bus and imposed upon the bus driver the duty to act in avoidance when he saw, or by the exercise of the highest degree of care could have seen, plaintiff approaching the path of the bus oblivious of the danger and intent upon continuing into its path. Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 S.W.2d 540; Hamell v. St. Louis Public Service Co., Mo.App., 268 S.W.2d 60, 63. Obviously, plaintiff came into a position of imminent peril sometime during the 16 or 17-foot "run" of the tri-car from its stationary position to the point of collision. In this case it was for the jury, not this Court, to find the point at which plaintiff came into a position of imminent peril. It is sufficient for our purposes that the jury reasonably could have found that plaintiff entered that position at or before the time he was halfway through his run. At or before that time it should have been reasonably apparent to the bus driver that the plaintiff was approaching the path of the bus, oblivious of the danger and intent on continuing into its path.

■ *Of failure to warn:* Viewed in the light most favorable to plaintiff, the evidence showed that in traveling from his stationary position to the point of collision

plaintiff traveled 16 or 17 feet, accelerating from zero to a speed of 5 m. p. h. The jury reasonably could find that plaintiff's average speed over this distance was approximately 2½ m. p. h. or less than 4 feet per second. See Hook v. St. Louis Public Service Co., Mo.App., 296 S.W.2d 123, 127. At that rate it would have taken approximately 4 seconds to reach the point of collision. In Sperry v. Tracy Dodge-Plymouth Co., Mo.Sup., 344 S.W.2d 108, 112, and Wofford v. St. Louis Public Service Co., Mo.Sup., 252 S.W.2d 529, 531, humanitarian failure to warn cases, this Court held that intervals of approximately 2 seconds were sufficient time for the reactions of the drivers and for plaintiff to take effective action in avoidance. In this case, if plaintiff reached a position of imminent peril at some point during the first half of his run and if the bus driver could have discovered plaintiff's peril during those first 2 seconds, there would have been time, allowing ¾-second reaction time to each driver, for the bus driver to have warned and for plaintiff to have heeded the warning and stopped. At a point halfway through the run plaintiff would still have been 8 or 8½ feet and approximately 2 seconds away from the point of collision. During the first 2 seconds of his acceleration from zero the jury could reasonably find that plaintiff was traveling at a speed less than the average speed for the entire distance; less than 2½ m. p. h. We take judicial notice of the fact that a motorcycle, under the circumstances shown, traveling at a speed of 2½ m. p. h. or less, could be stopped almost instantly; could be stopped in a minimal space. Compare Hamell v. St. Louis Public Service Co., supra, 268 S.W. 2d, l. c. 64; Smith v. St. Louis Public Service Co., Mo.App., 252 S.W.2d 83, 85.

This leaves the question whether under the evidence the bus driver could have discovered plaintiff's peril at or before the time plaintiff's tri-car was halfway through his run. We think so. The best proof of what the bus driver could have seen is the bus driver's testimony that he *did* see plaintiff, when plaintiff was at a point fixed by his testimony and that of other witnesses at 14 or 15 feet north of the north curb line of Washington, and when the bus was at the center line of 12th Street. True enough, he coupled this with statements that plaintiff was stationary at the time and that he never did see plaintiff in motion, but the jury could disregard these qualifications and accept his testimony that he saw plaintiff at that point and time. Plaintiff's witness Doyle's testimony strongly indicates that the tri-car had started up from its stationary position and was actually moving at the time the bus was at the center line of 12th Street, for Doyle placed the tri-car at the north curb line of Washington when the bus was 3 or 4 feet west of the center line of 12th. Reasonably the jury could find that when the bus driver first saw plaintiff, the latter, oblivious to danger from the approach of the bus, had commenced his run with the green light in his favor, intending to proceed into Washington, and that the bus was then 2 seconds or more in time and 56 or 57 feet in distance short of the position the bus occupied at the time of collision; that the bus was traveling at a moderate speed, and that the bus driver had sufficient time to issue a warning which would have effectively avoided the collision. Plaintiff established the minimum essentials of a case of failure to warn under the humanitarian doctrine.

■ Appellant objects, however, that having tried his case on the theory that the speed of the bus was 30 m. p. h. plaintiff cannot take advantage of defendant's evidence on the speed of the bus in determining whether he made a submissible case. An examination of the question and answer reveals that Doyle's judgment that the bus was traveling at 30 m. p. h. was an estimate or approximation, and not a positive declaration of fact. A plaintiff is not conclusively bound by his own or his witnesses' *estimates* of time, speed or distance. Davis v. Kansas City Public Service Co., 361 Mo. 168, 233 S.W.2d 669, 674; State ex rel. Thompson v. Shain, 351 Mo. 530, 173 S.W.

2d 406, 407–409; Davidson v. King, Mo. App., 309 S.W.2d 132, 135. It is true that a plaintiff may not have the benefit of other evidence as to speed which contradicts or is at war with his fundamental theory of the case, Fisher v. Gunn, Mo.Sup., 270 S.W.2d 869, 874; Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S.W.2d 600, 603–604, but plaintiff's case was not founded upon the theory that the bus was going 30 m. p. h. through the intersection. In his opening statement plaintiff's counsel predicted that the evidence would show that the speed of the bus was 15 or 20 m. p. h. In his closing argument counsel for plaintiff took the position that the "speed he came through the intersection there" was 15 m. p. h. Plaintiff was not conclusively bound by the unfavorable testimony of his bystander witness Doyle, Harrell v. Berberich, 359 Mo. 551, 222 S.W.2d 733, 735, that the speed of the bus was 30 m. p. h., but is entitled to draw upon the other more favorable figures given, namely, 8, 10–12, and 15 m. p. h.

Deferring our consideration of whether plaintiff made a submissible case on failure to swerve, or on a combination of failure to swerve and to warn, we turn now to appellant's third point, that the court erred in giving plaintiff's main verdict-directing Instruction No. 1 for the reason that it improperly injected defendant's antecedent negligence into a humanitarian submission. Instruction No. 1 follows: "The Court instructs the jury that if you find and believe from the evidence that on the occasion mentioned in evidence plaintiff was upon a police tri-car which was facing south on Twelfth Boulevard at or near the north crosswalk of its intersection with Washington Avenue in the City of St. Louis, and that the electric traffic signal at said intersection changed to green or go for southbound Twelfth Boulevard traffic, and that thereafter plaintiff moved and operated his said tri-car to the south and west so as to make a right turn into said Washington Avenue, and if you further find that defendant St. Louis Public Service Company, acting by and through its agent and servant Maurath, was operating a motorbus west on said Washington Avenue through said intersection, and that said motorbus was caused to come into collision with plaintiff's said tri-car while plaintiff was in the act of turning right onto said Washington Avenue, if you so find, and that plaintiff was directly injured thereby, and if you further find that after plaintiff began operating and moving his said tri-car, as aforesaid, if you so find and prior to said collision between said motorbus and said tri-car, if you so find, plaintiff's said tri-car became and was in a position of imminent peril of coming into collision with said motorbus, and of plaintiff being injured thereby, and if you find that defendant's employee Maurath saw, or in the exercise of the highest degree of care on his part could have seen plaintiff in the aforesaid position of imminent peril, if you so find, in time thereafter for defendant's employee Maurath, by the exercise of the highest degree of care, with the means and appliances then and there at hand and with reasonable safety to defendant's said motorbus and the occupants thereof and other persons and vehicles then and there about, to have swerved said motorbus and to have given a timely and adequate warning of the approach and proximity of said motorbus, and that by so doing defendant's employee Maurath could thus and thereby have avoided bringing said bus into collision with plaintiff's said tri-car, if you so find, *and if you further find that defendant's employee Maurath did fail to swerve said motorbus, and did fail to give a timely and adequate warning of the approach and proximity of said motorbus and thereby was negligent in so failing, and that plaintiff was injured as a direct and proximate result of the aforesaid negligence on the part of defendant's employee Maurath, if you find defendant's agent Maurath to be negligent as aforesaid, then the Court instructs you that the plaintiff is entitled to recover* and your verdict should be against the defendant and in favor of the plaintiff,

and this is true even though you may find and believe from the evidence that plaintiff was negligent in getting himself into the aforesaid position of peril, if any."

We have italicized the controversial portion of the instruction.

 The principle announced in the cases of White v. Kansas City Public Service Co., 347 Mo. 895, 149 S.W.2d 375, and Harrow v. Kansas City Public Service Co., 361 Mo. 42, 233 S.W.2d 644, considered in the light of the evidence and the argument of plaintiff's counsel in this particular case, convinces us that it was error to give Instruction No. 1. In the White and Harrow cases judgments for plaintiffs under humanitarian instructions substantially and fundamentally the same as Instruction No. 1 were reversed for *failure to exclude a recovery based upon primary negligence.* The very basis of a recovery under the humanitarian doctrine is negligent failure to act *after* the peril arises. Primary antecedent negligence is not to be considered, and plaintiff's instructions in a humanitarian case "must be so worded as to exclude a recovery based on primary negligence." White v. Kansas City Public Service Co., supra, 149 S.W.2d, l. c. 377. Instruction No. 1 does not require the jury to find as a predicate to a verdict for plaintiff that the alleged failure to warn and swerve hypothesized in the italicized portion of the instruction had reference to a time *after* plaintiff's alleged peril arose, and does not exclude, but permits, a recovery based upon acts of primary negligence. In Mayfield v. Kansas City Southern Ry. Co., 337 Mo. 79, 85 S.W.2d 116, l. c. 123, the rule was reaffirmed that "It is prejudicial error, in an instruction submitting humanitarian negligence, to inject therein primary negligence of the defendant * * *; to require consideration of any antecedent negligence of * * * defendant which existed prior to the time that the humanitarian doctrine properly commenced to operate; or to predicate recovery upon any different facts than those which actual-

ly existed at the time the peril arose and was discovered, or, if there was a duty to keep a lookout, when it was discoverable by the exercise of the required degree of care."

In that portion of Instruction No. 1 preceding the italics a humanitarian submission was stated in conventional form. But when it came to the requirement of a finding of failure to warn and swerve (the italicized portion), the language used was that of a primary negligence instruction. It failed to require in terms a finding that these failures occurred *after* imminent peril arose. Thus it allowed the jury to find for plaintiff upon the basis of two of the assignments of primary negligence charged in the petition (failure to warn, and failure to swerve), and then eliminated the defense of contributory negligence. If the instruction should be considered alone and abstractly, without reference to the circumstances of this particular case, a persuasive argument could be made that a jury would understand that the failures referred to in the italicized portion were the same failures that had just been hypothesized, viz., failures which occurred after the plaintiff was in imminent peril. Instructions, however, are not to be excised from the case and considered separate and apart from the circumstances under which they are given. In this particular case, when the language of the instruction is considered in the light of the evidence and the argument of plaintiff's counsel, it is apparent that the jury may have been misled and at the very least, must have been confused. Plaintiff himself testified to a physical situation which prevented him from seeing to the east beyond the center of 12th Street. He was at the rear of the hood of the automobile in the adjacent lane to his left. The other two lanes of solid traffic to his left blocked his view. If plaintiff could not see the bus until the bus reached the center of 12th Street then, under plaintiff's theory of the case, the bus driver could not be held to see plaintiff until the bus reached the center of 12th Street, in the absence of evidence

to the contrary. Since plaintiff's peril, under the evidence, was not discoverable until the bus reached the center of 12th Street, defendant could not be charged with any negligence on the part of the bus driver antecedent to that time and position. There was evidence that the traffic light turned red for the bus when the bus was 15 or 20 feet west of the east curb line of 12th Street (considerably short of the center line of 12th), i. e., turned red when the bus was 24 to 29 feet east of the first point at which the bus driver could have discovered plaintiff's position of imminent peril. If the jury followed the argument of plaintiff's counsel they were led to place the blame upon defendant for negligence of its bus driver committed *before* the bus reached the center of 12th Street; *before* the humanitarian doctrine commenced to operate. In his opening argument counsel for plaintiff argued that when the light for westbound traffic went amber "action begins to take place"; that the bus had 29 feet "until he gets to the center line, * * * before he hits the center, and after he hits the center he has forty-four more feet to go before getting across the street * * *. He [the bus driver] is in a jam. * * * [H]e moved up that fifteen feet away from the corner and out into the intersection when it was hazardous to do so. *And as he went across the street he went on a straight line. His words were, 'I did not deviate,' he didn't go out a little bit even to his left.* He isn't thinking of pedestrians or of anybody rightfully using any lanes. He is thinking of himself. He is going to get through, if you please, at the point he wants to." In his closing argument plaintiff's counsel argued "I think this man did a dastardly thing in violation of every element of the first instruction when he decided to come against the red light and increase his speed to get across *and never once as much as sounded a horn* for a man or anybody who might be turning the corner. * * * This fellow [plaintiff] wasn't looking for him, didn't know he was coming. * * * *He* [the bus driver] *knew about the red light before he*

*hit the center,* and he went all that distance. * * *" (Emphasis ours.)

Instruction No. 1, with the foregoing evidence and argument fresh in their minds, could mean to a jury that there was a duty to warn and swerve prior to the time the bus reached the center of 12th Street and before the imminent peril of plaintiff was discoverable, and that they could find for plaintiff regardless of the negligence of the plaintiff or the requirements of the humanitarian doctrine. Compare Mayfield v. Kansas City Southern Ry. Co., supra, 85 S.W.2d, l. c. 122 [5]. Under this evidence, instruction and argument the jury would have been allowed to find that it was the duty of the bus driver, proceeding against a red light through a busy downtown intersection during the rush hour, to sound a warning as soon as the light turned red and to continue sounding it until he had passed through the intersection, and to swerve to his left in anticipation of the approach of the southbound traffic even before he saw plaintiff and the tri-car. This would give plaintiff the benefit of the humanitarian doctrine by eliminating the defense of contributory negligence, while at the same time imposing upon defendant liability for acts of primary negligence occurring before the time the humanitarian doctrine commenced to operate.

Plaintiff seeks to distinguish instant Instruction No. 1 from the instructions in the White and Harrow cases, supra, on the basis that the latter submitted merely that defendant "failed" to stop or warn, whereas Instruction No. 1 submitted that defendant "did fail" to swerve and warn, and thereby was negligent in "so" failing; that the assignments of negligence in White and Harrow were submitted in the alternative and disjunctive, respectively, whereas they were submitted in the conjunctive here; and that in any case the jury would not be misled, because defendant's failures were of a continuing nature to the very instant of collision, so that from the required finding that the collision would have been avoided

by taking the measures conjunctively submitted, after notice of peril, it would follow as a matter of law that defendant was liable under the humanitarian doctrine if defendant *never* took such measures. These considerations do not change the fundamental fact that Instruction No. 1 failed to clearly inform the jury that the negligence hypothesized in the italicized part of the instruction referred to a time *after* the alleged peril of plaintiff arose.

■ Since the case must be reversed for this error in Instruction No. 1, we observe that it is questionable whether plaintiff should submit this case on humanitarian failure to swerve, or on any combination of defendant's omissions which may include failure to swerve, in view of the fact that plaintiff himself testified that there were pedestrians stepping off the curb and into the crosswalk, going from the north to the south, immediately west of the west line of 12th Street. There is no duty to swerve if in swerving defendant's vehicle will cause injury to pedestrians. It would be incumbent upon plaintiff in a failure-to-swerve case to prove that the way was open and clear for swerving with safety. Plaintiff met part of that burden by showing that there were no other westbound *vehicles* in the north half of Washington, but plaintiff testified affirmatively to facts indicating that *pedestrians* were in that area. Whether a submission of failure to swerve would be an improper statement of the law of the case, upon the basis of these facts testified to by plaintiff, raises a serious question. The harmless error rule of conjunctive submission has no application where "one of the grounds of negligence is an improper statement of the law." Beahan v. St. Louis Public Service Co., 361 Mo. 807, 237 S.W.2d 105, l. c. 107. And see Glowacki v. Holste, Mo.Sup., 295 S.W.2d 135; Wilson v. Kansas City Public Service Co., Mo. Sup., 291 S.W.2d 110.

This disposition of the case makes it unnecessary to consider other points raised by appellant, none of which will necessarily reoccur on a retrial.

The judgment is reversed and the cause is remanded for a new trial.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.