LOUIS PARTNEY, RESPONDENT, v. A. J. AGERS, APPELLANT.—187 S. W. (2d) 743.

St. Louis Court of Appeals. Opinion filed May 15, 1945.

*Wilbur C. Schwartz* and *Joseph Nessenfeld* for appellant.

766

*Al F. Gerritzen* for respondent.

ANDERSON, J.—This is an action for damages for personal injuries sustained by plaintiff when he was run into by defendant's truck. There was a verdict and judgment for plaintiff below, from which judgment defendant has appealed.

Plaintiff was employed as a roustabout by the Whaley & Scott Mining Company on the date of the accident, October 13, 1942, and had been so employed for about two years prior thereto. The accident occurred on the private property of Whaley & Scott Mining Company, where the mining company was operating a tiff mill. The property was situated immediately south of a public highway, which ran in an easterly and westerly direction. About 150 feet from the highway were two open bins, adjoining one another, and facing east. The north bin was used for the storage of tiff, and the south bin contained gravel. Both bins were set upon posts, so that trucks could back under them from the east, and could be loaded with tiff or gravel through openings in the bins. Altogether there were six of these posts, one at each corner, and two between the two bins, one in the front and the other in the back. The posts were 14″x14″ and were set on concrete bases, which bases extended about three or four inches beyond the posts.

For the use of the trucks in driving up to the bins, the mining company had built upon their property a gravel roadway, which ran east and west and extended up to the bins. The roadway was used frequently every day by trucks owned by the Whaley & Scott Mining Company and by others, including the defendant. Defendant's truck made about six trips a day over this roadway. According to the evidence, a load was hauled along this roadway from the bins about once every hour and fifteen minutes.

It was the customary practice for trucks to be driven south onto the premises from the public highway, and then turned toward the east, brought to a stop thirty or forty feet east of the bins, and operated backward at about two miles per hour over the gravel roadway toward and under the bins. The exact width of the bins was not shown by the evidence, but it would appear that when a truck with a body about seven and one-half feet wide was being driven under

either bin, the truck had only about five or six inches clearness between it and the supporting corner posts. In backing into one of these bins, it was the customary procedure for the driver to put his head out of the left side of the door opening, and to look backward as he backed the truck, the object being to just barely miss striking the north post. If the north post was cleared by a few inches, the driver knew that he was safe on the other side. It was impossible for the driver to look at both posts at the same time, and to proceed as above indicated, according to the testimony of John Ackerson, who was a witness for plaintiff.

Plaintiff himself testified that it was impossible for the driver of a truck to see both posts while backing, unless he looked through the rear window of the cab. Joe Merseal, defendant's driver, and a witness for the plaintiff, testified that in backing his truck down the roadway in question, he could see only the top of the tiff bin through the rear window.

Plaintiff knew the usual procedure followed by truck drivers in backing under the bins. He and other workmen on the grounds knew that defendant's truck made several trips daily to the premises to haul tiff, and that other trucks also came onto the premises to haul material several times a day. It was common knowledge that trucks backed in there, since that was the only way for them to get under the bins. All truck drivers used the same procedure in backing under the bins. Plaintiff's witness Ackerson testified that none of the drivers, including himself, ever blew their horns when backing along this roadway toward the bins. The truck drivers did not expect people to be around the bins when they were backing their trucks in the manner indicated. There was no obstruction of any kind between the trucks and the tiff bins when the trucks backed toward the bins. The road is clear and open.

On the day in question plaintiff's employer, Mr. Scott, met plaintiff on the premises about noontime, and asked him to get a large chain. He also handed plaintiff a lunch, consisting of a sandwich and a bottle of soda. Holding the sandwich and soda, plaintiff proceeded over to the gravel bin where John Ackerson, a truck driver employed by Whaley & Scott Mining Company, was seated in the cab of his truck eating his lunch. At that time Ackerson's truck was parked under the gravel bin, being loaded with gravel, the whole back end of the truck and about a third of the cab being under the bin. Ackerson told plaintiff, in response to his inquiry, that he did not have the chain and did not know where it was. Plaintiff was then standing next to the cab, while Ackerson was seated in the cab of his truck. While plaintiff was inquiring about the chain, Ackerson saw defendant's driver Joe Merseal drive onto the premises from the public road about 150 feet away, and turn east in front of the bins. At that time plaintiff did not see defendant's truck, nor did

he hear it as it approached. The mills were operating and making a loud noise, and the gravel running into Ackerson's truck was also making a loud noise at the time.

Ackerson then got out of his cab, and plaintiff stepped back a foot or two to give Ackerson a little more room. Plaintiff stated that Ackerson got out of the truck about the time he walked up to it. At another point in his testimony he said that he stood by Ackerson's truck about a minute before Ackerson got out of his truck. Ackerson then picked up a bucket and began to pour water into the radiator of his truck. As he was doing this, he stood five or six feet to the southeast of plaintiff. Plaintiff stated that he stood there watching Ackerson for about two and a half minutes, and then was hit by defendant's truck as it backed into the tiff bin. Plaintiff did not see the truck as it backed toward the tiff bin. When he was asked to explain how he could have avoided seeing defendant's truck as it slowly backed at least thirty feet, he answered: "I guess I was interested in eating my lunch." No horn was sounded from the time defendant's driver started backing the truck up to the time of the collision.

On direct examination plaintiff testified that he stood about a foot or eighteen inches east of the center post, which separated these two bins, and about opposite the center of it. He stated that he stood in that position eating his sandwich from the time Ackerson got out of his truck.

He reiterated this testimony on cross-examination, and stated that as he stood there he could have been in the line of the truck, but did not think he was in front of or under the bin. He further stated: "I don't know exactly where I was standing. I was east of the post, but whether I was in front of the center or not, I don't know."

Just before plaintiff was struck, Ackerson holloed "Watch out." On cross-examination plaintiff testified that when Ackerson holloed, he guessed he jumped backward something like one foot, and was immediately struck by the right rear side of the truck; that had he not jumped he would not have been apt to have been hit; that he was knocked between the bed of the truck and the post, and that just before the accident he might have been leaning against the post. He stated, "I would not say whether I was standing against it or east of it." After he so testified, the court adjourned for the noon recess. When the court re-convened, the following testimony was given by plaintiff on his second redirect examination:

"Q. I just want to ask you one question and get this matter cleared up about the jumping. Which direction did you jump just before you were hit? A. I jumped in order to clear myself, to the south I would call it.

"Q. In jumping to the south, did you jump backwards or forwards? A. Jumped forwards.

"Q. Which way were you facing, front part of your body, as you jumped to the south? A. My body was facing the south, the front part of my body.

"Q. Now, what direction would that be facing the Ackerson truck? A. Would be right straight facing it.

"Q. Away from Ackerson's truck or toward it? A. Toward it. I cannot get it just right the way I want to say it.

"Q. When you jumped forward, which way did you go toward the Ackerson truck? A. Right straight toward it, I thought.

"Q. Toward it or away from it? A. Toward it, toward the cab and front end, is what I thought."

Later, on second re-cross examination, plaintiff (after denying that he had talked to anyone during the noon recess) testified:

"Q. Now, this morning, or rather, before lunch, I carefully went over the facts of the matter, where you were standing and where you were facing and what you could see, is that right? A. Yes, sir.

"Q. Then I asked you what you did when Mr. Ackerson holloed at you, is that right? A. Yes, sir.

"Q. And you said that you had jumped, didn't you? A. Yes, sir.

"Q. And I asked you what direction you jumped and you said you jumped backwards? A. I did at that time, but I saw my mistake after I said it.

"Q. If you had jumped forward, you were standing alongside of this post about a foot or so to the east of it, if you had jumped forward the truck never would have hit you, would it? A. Not if I jumped far enough, it wouldn't, I guess.

"Q. How far did you jump? A. I can't tell you exactly.

"Q. This morning you told me you jumped backwards about a foot? A. I told you about a foot.

"Q. You were leaning against the post, I believe you said in your deposition, on the east side? A. Yes, sir.

"Q. If you were standing leaning against the post as in Exhibit No. 5, you would not have been hit? A. I could have been.

"Q. How could you have been without hitting the post? A. It hits the post occasionally.

"Q. It did not, did it? A. No, sir.

"Q. This morning you told me you jumped back about a foot and was knocked by the right-hand side of this truck into the post, that is right? A. Yes, sir.

"Q. That is how this accident happened, isn't it? A. Yes, sir."

John Ackerson, testifying for plaintiff, stated:

"On October 13, 1942, just before noon, I was sitting in the cab of my truck eating lunch, when Partney came there and asked me

for a log chain. I told him I didn't have it and didn't know where it then was. At that time my truck was under the south bin and about two-thirds of the cab and the hood set out from under the bin. I was sitting there in the truck when he said that and when I looked up I saw Mr. Merseal coming in from the highway, which was approximately 150 or 200 feet; I never did measure the distance. As he come in, he turned east. By that time I got out of the cab and Mr. Partney stepped back a foot or so to give me a little more room. I stepped out to get a water bucket and poured water in my radiator. When I glanced up Mr. Merseal's truck was eight or ten inches from Mr. Partney. I holloed, 'Watch out,' and when he did he jumped and sort of stepped up and the truck hit him about then.

"Partney jumped forward, toward the south.

"When Partney jumped he was standing about eighteen inches from the post, kind of in a northeast position, facing south. I yelled at the driver to stop, because he had already hit the man at the time. I yelled at Mr. Partney and as he jumped the truck caught him. The rear end of the truck hit him in the hip and shoved him over toward the post and, as it came back, it just turned him against the post. As he got up he was facing north and started to make a step and fell three or four feet. He was facing south and come back facing east, and when he got past the post he was facing north. The truck moved three or four feet from the time it hit him until it stopped. After it came to a stop the rear end of the truck was two and a half or three feet under the tiff bin. I did not hear the horn sounded at any time by Mr. Merseal.''

The witness further testified that when he first noticed the truck backing up, it was eight or ten inches from the plaintiff, and at that time plaintiff was standing in the path of the truck. He further stated that when the truck came off the highway, plaintiff was standing east of the center post.

On cross-examination the witness testified that when he holloed, plaintiff was just about at the corner of the truck.

The only duty that plaintiff had in and around the bins in question was to go under them occasionally to shut off the holes, through which the tiff or gravel flowed, when the truck drivers failed to do so. This did not happen very frequently, plaintiff testifying that sometimes he would go for a week and not be under the bins. Sometimes he would help defendant's driver load his truck. He had no other business under the bin.

Joe Merseal, defendant's driver, was called as a witness by plaintiff. He testified that he did not see plaintiff at any time before the accident; that he drove into the grounds at the rate of about ten miles per hour, made a left-hand turn to the east, and stopped his truck when about thirty or forty feet from the bin. As he came into the grounds, he looked under the tiff bin, but saw nobody around there.

He then lined up his truck, put his head out of the door on the left or north side, and backed his truck slowly at the rate of two miles per hour, keeping a watch on the north post in order to clear it by a few inches. He stated that at that rate of speed he could stop his truck in two feet. He looked backwards under the bin before starting to back his truck, but made no effort to look back from the right side of the truck. He did not stop and look from the time he started backing until the time of the collision. The bed of his truck was four feet under the bin when he stopped. He testified that he did not know where plaintiff was when he was struck. At no time did he ever hit the center post. While he was backing the truck, he heard someone shout, and he stopped his truck within two feet thereafter. He testified that he did not anticipate that anybody would be at the bin.

The only negligence submitted to the jury was defendant's alleged negligence under the humanitarian doctrine.

The first assignment of error is that the court erred in refusing to give to the jury defendant's requested instruction in the nature of a demurrer to the evidence because no case for the jury was made under the humanitarian doctrine. In support of this assignment, appellant contends that no such case was made for the reason that the evidence conclusively shows that plaintiff was not in a position of imminent peril until he jumped from a position of safety at a time after which it was impossible for defendant by the exercise of due care to have avoided injuring him.

It is also contended that since the evidence showed that defendant was unaware of plaintiff's presence at the time and place in question, no humanitarian case was made, because the collision took place on private property and at a place where defendant was under no obligation to know of plaintiff's presence under a continuous lookout duty.

Before we can pass upon the first proposition above mentioned, it will be necessary to determine the facts established by the evidence with reference to the alleged position of peril. The testimony on this matter is in hopeless conflict.

Plaintiff on his direct and cross-examination testified to one state of facts, and then on re-direct examination testified to another, and on re-cross examination reaffirmed what he had said on his original cross-examination. In this state of the record, we must accept as true the testimony given by him on his original direct and cross-examination. [Feeherty v. Sullivan (Mo. App.), 129 S. W. (2d) 926.] Any statement against interest made by a party absent a reasonable explanation avoiding it must be taken as true. [Steele v. Kansas City Southern R. Co., 265 Mo. 97, 175 S. W. 177; Hayes v. S. S. Kresge Co. (Mo. App.), 100 S. W. (2d) 325; McCoy v. Home Oil & Gas Co. (Mo. App.), 60 S. W. (2d) 715; DeLorme v. St. Louis

Public Service Co. (Mo. App.), 61 S. W. (2d) 247; Madden v. Red Lines Service (Mo. App.), 76 S. W. (2d) 435.]

The testimony then with reference to plaintiff's position at the time defendant's truck backed down the roadway, which we must accept as true, is found to be as follows:

### DIRECT EXAMINATION.

"Q. If this was the timber between the two bins, what side of the timber were you standing on? A. About the center of the timber, the best I remember.

"Q. How far East of the timber? A. I figure a foot or eighteen inches, something like that.

"Q. What part of the rear end of that truck struck you, Mr. Partney? A. The right-hand side of the dump bed.

### CROSS-EXAMINATION.

"Q. You were standing about a foot or so East of this post? A. Yes, sir.

"Q. And right opposite the post? A. Yes, sir.

"Q. You were just to the East of this post in a line with this post? A. Yes, sir.

"Q. When he holloed, what did you do? A. I jumped.

"Q. Which way did you jump? A. I guess I jumped backwards.

"Q. That would be the natural thing to do and that is what you think you did? A. Yes, sir.

"Q. About how far would you say you jumped backwards? A. About a foot or something like that.

"Q. And you got hit by the right side of this truck, didn't you? A. Yes, sir.

"Q. At the back end? A. Yes, sir.

"Q. On the right rear west side? A. Yes, sir.

"Q. Now, of course, if you had not of jumped you would not have got hit? A. Not apt to.

### SECOND RE-CROSS EXAMINATION.

"Q. This morning you told me you jumped back about a foot and was knocked by the right-hand side of this truck into the post, that is right? A. Yes, sir.

"Q. That is how this accident happened, isn't it? A. Yes, sir."

Our Supreme Court, in setting forth the constitutive elements of a cause of action under the humanitarian doctrine, has denominated the position of peril as the chief factor of liability. [Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482.] The peril of the injured party is the real foundation upon which the doctrine rests. [State ex rel.

Vulgamott v. Trimble, 300 Mo. 92, 253 S. W. 1014.] And that peril must be something more than a bare possibility of an injury occurring. [State ex rel. Vulgamott v. Trimble, *supra*; Wallace v. St. Joseph Ry. Light, Heat & Power Co., 336 Mo. 282, 77 S. W. (2d) 1011.] It must be a certain and not a contingent danger. [Stewart v. Missouri Pacific R. Co., 308 Mo. 383, 272 S. W. 694.] And, as said by WHITE, J., in the Banks case: "The peril would be imminent only when the ordinary and natural effort to be expected in such person would not put him in a place of safety."

In the case at bar, plaintiff was not in the path of the truck as it swung onto the premises. Nor was he in its path as it backed down the roadway in question until it reached a point a few inches east of plaintiff, when in response to a shout from Ackerson plaintiff jumped backward, and was almost immediately struck by the side or right rear corner of the truck. Was he in a position of peril prior to that time?

It appears that plaintiff was standing facing southeast, and the evidence contains nothing which would tend to show that he gave any indication of an intention to move toward the path of the truck. Such being the case, the possibility that plaintiff might do the unusual and jump backward into the path of the oncoming truck was not such certainty of peril as is required to create a position of peril under the humanitarian doctrine. We are compelled to this conclusion by the decision of our Supreme Court in Kirkham v. Jenkins Music Co., 340 Mo. 911, 104 S. W. (2d) 234. In that case plaintiff was injured by being struck by defendant's car. She had attempted to cross Walnut street from east to west, in the pedestrian's way on the south side of Twelfth street. When she arrived at the safety zone east of the cartracks on Walnut, the traffic light changed for north and south traffic. She stopped in the safety zone, and then walked south in the safety zone to permit passengers to alight from a northbound streetcar. After the passengers had alighted and had left the safety zone, plaintiff walked due north in the safety zone, intending to turn west in the pedestrian way when the traffic lights should change, and according to her evidence as she then proceeded north she was run into by defendant's car, which was northbound in Walnut street. She stated that she did not see defendant's car approaching, and was given no warning. Defendant testified that he was traveling north in the east cartracks, and when he reached a point a few feet south of plaintiff, she suddenly turned, and took a step into the path of his car; that he swerved, and stopped his car in a few feet, but the fender of his car struck plaintiff, knocking her down. There was a verdict and judgment for defendant. On appeal, plaintiff assailed defendant's instruction which told the jury that defendant had a right to assume that plaintiff would not step out

of the safety zone, and that defendant owed plaintiff no duty until it became apparent to him that plaintiff intended to move from said safety zone. The court rejected plaintiff's complaint, and held that the peril did not arise under defendant's evidence until defendant could have discovered, by the exercise of the highest degree of care, that plaintiff intended to step out of the zone to the west. The court said:

"In the case now before us no collision would have occurred if both parties had continued to travel due north. Of course there existed the possibility that the plaintiff might change her course and go west. But under the humanitarian doctrine the word "peril" means certain peril, and not the bare possibility that a collision might result."

Another case in point is Goodson v. Schwandt, 318 Mo. 666, 300 S. W. 795. In that case plaintiff's husband, Frank Goodson, was struck by defendant's car, and died as a result of his injuries. Defendant, accompanied by Will Mays and Elmer Ruthsatz, was driving east on Locust street. Mays testified that they stopped at 17th street, even with the building line, and with their right wheels two to four feet from the curb. After a car going north on 17th street had passed in front of them, they honked their horn, and started east. Just as the northbound car got across, plaintiff stepped off the Locust street sidewalk, just east of the east building line on 17th street, and walked north about six or eight feet, until he was to the left of the path of defendant's truck. He then jumped back, out of the path of a westbound automobile that had turned out of the westbound line of traffic, and as he did so, the left front fender of defendant's truck hit him. Defendant blew his horn a second time when the front end of his car was about even with the east building line, and about the time that the westbound car pulled out of the line of traffic. Goodson was then about four feet in front of defendant's car, which was moving six or eight miles per hour. The court held that no case was made under the humanitarian doctrine, and said:

"It is clear that at the instant Goodson discovered he was in danger of being run over by the third automobile he was out of the path or course of the truck. He became confused, suddenly jumped back towards the south, and was instantly struck by the corner of the truck's left fender. His jumping back was the proximate cause of the collision and of his injuries. We think the evidence for the plaintiff clearly shows that the injury to her husband was purely accidental and unavoidable by the defendants."

Our conclusion is that plaintiff came into a position of imminent peril when he jumped backward from a position of safety into the path of the truck, and that thereafter there was no possibility for defendant to have taken any action whatsoever to have prevented injury to him. [Goodson v. Schwandt, *supra*; Kirkham v. Jenkins Music Co., *supra*; Rafferty v. Levy (Mo. App.), 153 S. W. (2d) 765; Bach v. Diekroeger (Mo. App.), 184 S. W. (2d) 755.]

We shall next consider appellant's second proposition, namely, that no humanitarian case was made because plaintiff failed to show that defendant's driver was aware of plaintiff's presence at the time and place in question. Appellant's theory here is that under the facts and circumstances in evidence, the discoverable peril theory cannot be applied to this case. The humanitarian doctrine is applied to discoverable peril only when there is an obligation on the defendant to know of such imminent peril under a continuous lookout duty at places and under circumstances where to look is to see and to know. [Mayfield v. Kansas City Southern R. Co., 337 Mo. 79, 85 S. W. (2d) 116; State ex rel. Brosnahan v. Shain, 344 Mo. 404, 126 S. W. (2d) 1193.]

In the Brosnahan case, plaintiff's husband was employed to remove rubbish from the defendant's premises, which he did by using a pushcart, which he operated over the defendant's driveway. It was his practice to come onto the premises on the first Monday in each month. While so engaged, the deceased was run over and killed by defendant's car, as defendant backed it from the garage. On the day in question defendant had seen a trashman nearby on the street, and assumed he would be in to collect the trash, as that was the day for collecting it. Plaintiff recovered under the humanitarian doctrine as applied to discoverable peril. The Kansas City Court of Appeals affirmed. On *certiorari*, the Supreme Court denied recovery on the ground that the humanitarian doctrine as to discoverable obliviousness was limited to places which were either public places, or in the nature of public places, because they were frequented and used by many persons.

In Mayfield v. Kansas City Southern Ry. Co., 337 Mo. 79, 85 S. W. (2d) 116, Mayfield was a special agent of the Burlington Railway. The yards of the Kansas City Southern Ry. Co. extend in a north and south direction, and contain six tracks. On the night of July 8, 1929, Burlington train No. 75, consisting of an engine, a car, and a caboose, entered the yards from the north on track 5, followed by a transfer movement of defendant Kansas City Southern, consisting of two refrigerator cars shoved by an engine. The distance between the two trains was variously estimated at from 40 feet to 125 feet. The caboose on the Burlington train was lighted by the cupola light, by two side markers, and a white lantern; the interior was also lighted, and the rear door was open. Both trains were proceeding at from four to six miles per hour. Defendant's engine was drifting, and consequently made no noise. The night was dark and clear, although there was no moon. On track 4, east of track 5, there was another Burlington train of twenty freight cars. The Burlington train on track 5 stopped a few feet south of the south end of the train on track 4. Organ, a Burlington switchman, was standing three or four car lengths north of the point where the two trains came down track

5 and passed him. According to plaintiff's evidence, Roberts, a Southern switchman, was sitting on the west side of the last refrigerator car (the engineer's side of the train) about eight or nine feet from the end, with his lantern lighted and placed on his right side; and Johnson, defendant's switch foreman, was sitting a few feet away from him and the end of the car, without any lantern lighted. Daume, the Burlington brakeman, was standing on the rear platform of the caboose. He did not notice any one on or near the track. Roberts testified that when the two movements were midway in the yards, a man stepped from the east onto track 5, immediately behind the lighted Burlington caboose; that he had a light, and was flashing it on the ground; that Roberts saw him just a few seconds, and supposed he would get away. Thereafter Roberts felt the car run over something, and remarked to Johnson that it felt as though they might have run over a piece of wood. It made the car rock, and was about where he had previously seen the man. Later Mayfield's dead body was found. Investigation showed that the Burlington had not run over anybody, but that defendant's train had. Walsh, a Burlington car inspector, said that he had seen Mayfield a short time before looking at stock in the train on track 4. Defendant's evidence was that there were lights on the front of the lead car of the transfer; that both Johnson and Roberts were there keeping a lookout; that Johnson's light was on.

It was held that it was error to submit discoverable peril as a part of the humanitarian case, since the accident did not happen at a place where, because of its use or character, a duty to keep a lookout existed. The court said:

"We have extended the doctrine further than many other states in considering discoverable peril at all. The doctrine originally was based upon actual superior knowledge by the defendant of a plaintiff's peril, from which a duty of care arose, and it therefore applied only to actually discovered peril. [Citing authorities.] Although we have thus greatly widened the field of its application, we have not included peril not actually discovered, unless the place of the accident was a place where the operator of the instrumentality was, at all times he approached it, under a legal duty to keep a lookout."

The question then for our determination is whether under the facts in the case at bar there was a continuous duty on the part of the defendant's truck driver to watch for plaintiff and other employees while using the roadway in question in the manner indicated by the evidence.

The accident happened on private property where a private enterprise was being carried on. The persons that truck drivers would likely encounter there were those engaged in work about the premises, as plaintiff was, and who were familiar with the character and nature of the operations there being carried on. Trucks frequently

moved over this private roadway, a fact concerning which plaintiff and the other workmen were thoroughly familiar. It was necessary for truck drivers to back their trucks down this roadway so as to get under the bins, and in doing so it was necessary that they concentrate their attention toward guiding their trucks into a very narrow space. Their vision to the rear at the time was very limited. Plaintiff and the other workmen were aware of these facts, and were under a duty to look out for themselves.

In such a situation, the measure of duty owed by defendant to plaintiff and other employees ought not to be the same as the duty owed to a person on a public highway or other public place. Under the circumstances shown in the evidence, defendant's driver should have the right to expect the roadway in question to be clear, and the right to expect that all employees would look after the movement of trucks along this roadway, and to take care for their own safety. Therefore, defendant's driver was not required to keep a constant lookout ahead for plaintiff.

It necessarily follows that in this case the humanitarian doctrine cannot be applied to discoverable peril, and since plaintiff failed to show that defendant's driver saw the plaintiff at any time prior to the collision, no case at all was made under the humanitarian doctrine.

The judgment appealed from is reversed. *Hughes, P. J.*, and *McCullen, J.*, concur.