CARROW

v.

TERMINAL R. ASS'N OF ST. LOUIS.

No. 28861.

St. Louis Court of Appeals.

Missouri.

April 20, 1954.

Rehearing Denied May 17, 1954.

Hullverson & Richardson and James W. Jeans, St. Louis, for plaintiff-respondent.

. Warner Fuller, Arnot L. Sheppard and John P. Montrey, St. Louis, for defendant-appellant.

BENNICK, Judge.

This is an action for damages for personal injuries sustained by plaintiff, Juanita Carrow, when an automobile in which she was riding as a guest was struck by a locomotive engine owned and operated by defendant, Terminal Railroad Association of St. Louis.

Tried to a jury in the Circuit Court of the City of St. Louis, a verdict was returned in favor of plaintiff, and against defendant, for the sum of $7,500. Judgment was rendered upon the verdict; and following an unavailing motion for judgment in accordance with its motion for a directed verdict or, in the alternative, for a new trial, defendant gave notice of appeal, and by proper successive steps has caused the case to be transferred to this court for our review.

The accident happened about 6:00 p. m. on November 23, 1951, at a point where defendant's tracks cross over a private road leading into the plant of the Monsanto Chemical Company in the Village of Monsanto in Illinois.

At the time of the accident plaintiff resided in East St. Louis, Illinois, and was employed by the McQuay-Norris Manufacturing Company at its plant at 4100 Forest Park Boulevard in St. Louis, Missouri. Her home was near that of her sister-in-law, Dorothy Cox, who was also employed by McQuay-Norris, and who drove to and from work in her own private automobile. Plaintiff rode with Mrs. Cox each day, as did also Mrs. Cox's husband (plaintiff's brother), Charles H. Cox, who was employed at the Monsanto Chemical Company's plant in Monsanto, Illinois. Under the practice that was followed, Mrs. Cox would first take her husband to his place of work each morning, and then come over

with plaintiff to the McQuay-Norris plant in St. Louis. At the close of work at 4:30 each afternoon the procedure would be reversed, with Cox picked up at his place of work as the last stop on their route before the parties reached their respective homes.

The Village of Monsanto is situated a short distance south of East St. Louis on State Highway No. 3, which runs generally north and south in a course that follows the Mississippi River. Slightly to the north of the Monsanto Company's plant is a public street known as Monsanto Avenue, which runs east and west and intersects Highway No. 3 at right angles. At a point a quarter of a mile to the east of Highway No. 3, the private road already referred to runs south from Monsanto Avenue into the company's plant. Paralleling Monsanto Avenue, and approximately 50 feet to the south of it, are defendant's railroad tracks, two of which go across the private road.

It was shown that this private road together with an adjacent sidewalk for pedestrians constituted the only means of access to the plant for the 1,800 to 1,850 men who were employed there at the time of the accident. In other words, the only way for the employees to get into the plant, whether they came on foot or by automobile, was to cross the two railroad tracks at the point where they passed over the private road. The same was also true of visitors to the plant, whether they came for business or for personal reasons. Within the area of the plant were two parking lots, one for commercial vehicles and the other for pleasure cars. Each of the lots was able to accommodate approximately 30 vehicles. All the members of defendant's switching crew were aware of this usage of the private road which had existed for the whole time that each of them had been employed on the job.

On the afternoon in question plaintiff's and Mrs. Cox's destination was the visitors' parking lot inside the enclosure where they expected to pick up Mrs. Cox's husband, Charles H. Cox. This was a practice which was general among the relatives of employees, and had been followed by Mrs. Cox

herself for about three years. Mrs. Cox was driving the automobile, and plaintiff was sitting in the front seat beside her.

The day was misty and foggy, and it was beginning to be quite dark by the hour of 6:00 o'clock. Mrs. Cox was driving with her lights turned on, and the headlight of defendant's locomotive was in "dim" position. Along the north side of the plant enclosure, and between it and the railroad tracks, is a row of poles at intervals of 100 feet extending west from the private road to Highway No. 3. Some 5 to 8 of these poles were equipped with lights which were burning at the time of the accident.

As Mrs. Cox turned south into the private road from off of Monsanto Avenue, she was traveling at a speed of from 7 to 10 miles an hour, with the right side of her automobile about a foot from the curb. Her automobile was in second gear as she made the turn, and she continued on in second gear until the occurrence of the accident.

When Mrs. Cox reached a point about 10 or 12 feet from the first railroad track, she reduced the speed of her automobile, and both she and plaintiff looked to the right and to the left for approaching trains, but saw nothing. There was evidence to show that due to the fog and mist, the lights to the right, including the dimmed headlight of the locomotive approaching from that direction, created a general blur which tended to obscure the locomotive, which was a Diesel engine painted "dirty gray".

With nothing apparent to give cause for alarm, Mrs. Cox accelerated her speed to some 10 or 12 miles an hour, and started on to cross the tracks. She was over the first track, and within 6 to 8 feet of the first rail of the second track, when both she and plaintiff saw the approaching locomotive, which, according to their own estimate, was then only 12 to 15 feet away. The locomotive was to their right, as has already been indicated, and was pulling two tank cars, one loaded and one empty. Neither plaintiff nor Mrs. Cox had heard a whistle or bell, although plaintiff's side window was lowered for 3 or 4 inches to permit the es-

cape of the smoke from her cigarette. Faced with this sudden dilemma, Mrs. Cox decided to go on across the track ahead of the locomotive, and after immediately picking up speed had actually cleared all but the last rail of the track when the locomotive struck the extreme rear end of the right rear fender, causing the automobile to be pushed for 35 feet to the left, or about the width of the private road.

One Haney, the engineer in charge of the locomotive, was called as a witness for plaintiff. He sat in the right side of the cab, 40 feet back from the front of the locomotive. From his position he could see nothing immediately to his left or in the direction from which the automobile was approaching, but was forced to rely upon his fireman, Curtis, who was seated on the left side of the cab, as well as upon his foreman, Brown, who was riding upon the platform which extended across the front of the locomotive.

Neither plaintiff nor Mrs. Cox had been able to form an opinion as to the speed of the locomotive, but Haney testified that it had approached the crossing at a speed of 5 miles an hour. Brown, the foreman, who was a witness for defendant, put the speed at not over 6 miles an hour. Haney testified that under the conditions then existing, and at a speed of 5 miles an hour, it required a space of 4½ feet to bring the locomotive to a stop.

While the members of the switching crew differed materially from plaintiff and Mrs. Cox as to certain of the important details of the evidence, they were in agreement with them regarding what might be said to have been the general pattern of the accident.

Both Brown and Curtis had noticed the automobile as it made its right turn off of Monsanto Avenue into the private road. While it was the duty of both men to give warning to Haney of the approach of vehicles towards the tracks, it appears that in the case of a vehicle approaching from the left or on the fireman's side, Haney regarded Curtis as primarily responsible for a lookout, and as a matter of practice between himself and Curtis was inclined to defer to Curtis' judgment as to what should be done to avoid an accident.

As the automobile made the turn into the private road, Curtis warned Haney of its approach, and at the same moment Brown gave Haney an "easy" signal with his lantern, which was designed to serve the same purpose as Curtis' oral admonition. The locomotive was about 42 feet in length, and under the varying estimates of the members of the crew was still distant from the crossing a little better than its length, if not as much as 75 feet, when the automobile turned off of Monsanto Avenue.

From the moment the automobile turned south into the private road, both Brown and Curtis continued to watch it, and Curtis kept Haney informed of its movements as it proceeded in the direction of the crossing.

Haney testified that when the locomotive was about 40 feet from the crossing, Curtis told him that he believed the automobile was going on over the crossing, whereupon he put his brakes on slightly. Curtis then said, "No, she is slowing up, she is going to stop", and as he released his brakes in response to such suggestion, Curtis informed him that the automobile was stopped. However in almost the same breath Curtis added, "No, she is going over", and at the same instant Brown gave an emergency "stop" signal with his lantern. According to Haney's estimate of the situation, the locomotive was only 4 or 5 feet from the edge of the road when Curtis told him that the automobile was going on across, and when Brown gave him the "stop" signal just referred to. Brown testified that at the moment he gave the signal the bumper of the automobile was at the edge of the ties, which is to be taken, however, in the light of the contention of himself and the other members of the crew that the collision occurred on the first track rather than on the second track as plaintiff and Mrs. Cox had insisted.

In her petition plaintiff set up eight grounds of negligence, some statutory and some at common law, and then coupled the same with a charge that in operating the

train over the crossing under the circumstances existing at the time, defendant was guilty of wanton misconduct in willfully and negligently failing to sound a warning or to slacken the speed of or stop the train, when its operatives saw, or by the exercise of ordinary care could have seen, the approaching automobile.

Although plaintiff requested the court to submit her case upon both negligence and willfulness, the court refused her negligence instruction and submitted the case solely upon the issue of willfulness involving the question of whether Haney had willfully and wantonly failed to heed Brown's "stop" signal, when by so doing he could have stopped the train or have slackened its speed in time to have avoided the accident.

 At the outset of the case defendant challenges the sufficiency of the petition to state a claim upon which relief can be granted in view of the inclusion in the petition of charges of both negligence and willfulness, which defendant contends are repugnant and self-destructive. Of course there is the fundamental distinction that in the case of negligence or mere failure to observe a prescribed standard of care, the injury is unintentional, while in the case of willfulness or utter disregard of the consequences, the injury is said to be either actually or impliedly intentional. Nichols v. Bresnahan, 357 Mo. 1126, 212 S.W.2d 570. But even so the two species of conduct are not necessarily repugnant, and a willful act may in fact include, and often does include, the element of negligence. McClanahan v. St. Louis Public Service Co., Mo.Sup., 251 S.W.2d 704; Consentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546. In this instance it is to be kept in mind that we are dealing purely with a question of pleading, and it is enough to say that the joinder of charges of both negligence and willfulness did not render the petition a nullity so as to be subject to the objection which defendant voices against it. Agee v. Herring, 221 Mo.App. 1022, 298 S.W. 250. There is no question before us of what the situation would have been had the court undertaken

to submit the case upon both theories, since, as we have already pointed out, it refused plaintiff's requested instruction on negligence and sent the case to the jury upon the issue of willfulness alone.

Defendant insists, however, that quite apart from any question of the propriety of the joinder of a charge of willfulness and wantonness with one of negligence, the petition was in any event insufficient to constitute a charge of willfulness and wantonness because of its failure to allege that defendant's servants had had actual knowledge of plaintiff's presence in a position of peril, and then, while possessed of such actual knowledge, had been guilty of willfulness and wantonness in permitting the collision to occur.

The truth of the matter is that the petition did allege actual knowledge, that is, that defendant's servants saw the approaching automobile in a position of being struck by the locomotive; and if the petition was in anywise at fault as respects the matter of charging knowledge, it was that it predicated liability, not only upon actual knowledge, but also upon constructive knowledge or the fact that defendant's servants could have seen the approaching automobile.

 The answer to the problem is, however, that under the circumstances otherwise pleaded it was not essential that a charge of willful and wanton misconduct on the part of defendant's servants should have been expressly conditioned upon actual knowledge, although the evidence later showed they had it. The petition alleged that the crossing was not only open but extra hazardous, as defendant's servants knew it to be. In other words, the case pleaded in the petition was one where the presence of members of the public was reasonably to be anticipated and where the likelihood of injury was inherent in the situation, so that liability for the resulting injury was not to be limited to mere inaction after actual knowledge of plaintiff's peril, but likewise would have embraced a reckless or careless failure to discover the danger for which a lookout was required.

For its next point defendant argues that plaintiff failed to make a case for submission to the jury upon the theory of willfulness and wantonness.

What constitutes willfulness and wantonness is governed by the law of Illinois, which is to the effect that a willful or wanton injury must have been either intentional, or (as in cases of this character) the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others and a conscious indifference to consequences, such as the failure, after knowledge of impending danger, to exercise due care to prevent it, or the failure to discover the danger through carelessness or recklessness when it could have been discovered by the exercise of due care. Schneiderman v. Interstate Transit Lines, 394 Ill. 569, 69 N.E.2d 293; Robertson v. New York Cent. R. Co., 388 Ill. 580, 58 N. E.2d 527; Brown v. Illinois Terminal Co., 319 Ill. 326, 150 N.E. 242, 151 A.L.R. 1; Bremer v. Lake Erie & W. R. Co., 318 Ill. 11, 148 N.E. 862, 41 A.L.R. 1345; Jeneary v. Chicago & I. Traction Co., 306 Ill. 392, 138 N.E. 203; Illinois Cent. R. Co. v. Leiner, 202 Ill. 624, 67 N.E. 398.

In this case not only was the use of the crossing so heavy that it was necessary for the switching crew to be continually on the alert on all occasions, but it is a conceded fact that in this particular instance the members of the crew had actual knowledge of the approach of the automobile from the time it turned into the private road from off of Monsanto Avenue. Both Brown and Curtis testified that they had watched its progress until the very moment of the collision. If so, viewing the evidence in its most favorable aspect to support plaintiff's theory of the case, they saw or could have seen the automobile slow up when it was still 10 or 12 feet from the first railroad track, and then start up at an accelerated speed indicative of the fact that its occupants intended to go on across. Even when the automobile was over the front track and within 6 or 8 feet of the first rail of the second track, the locomotive was still from 12 to 15 feet away, which was much more than a sufficient distance within which it could have been stopped short of a collision according to Haney's testimony in that regard. If these facts were believed, then the jury would have been entitled to find that the failure of defendant's crew to prevent the accident exhibited a reckless disregard for the safety of others and a conscious indifference to the consequences of their acts. The motion for a directed verdict was properly overruled.

But while plaintiff had a case for the jury as we have just pointed out, she chose to disregard such state of facts in the submission of her case by instruction No. 1, and instead went to the jury upon a restricted hypothesis that Brown, the foreman, saw the automobile approaching the track and gave a "stop" signal to Haney, the engineer, but that Haney failed to heed such signal and either stop the locomotive or slacken its speed in time to avoid the collision, although he could have done so after the signal was given.

As we read the record, the evidence did not warrant the submission of the case upon such theory of liability.

The trouble comes about by reason of considerable confusion, particularly in Haney's testimony, as to the respective locations of the locomotive and the automobile at the time Brown's "stop" signal was given. Certain of Haney's statements, standing alone, would undoubtedly have supported the instruction. However it subsequently appeared that those statements did not reflect Haney's actual version of the facts.

It is the law that where a witness makes inconsistent statements in his testimony, but before leaving the stand explains and repudiates such inconsistencies, the matters repudiated no longer have probative force as the testimony of the witness, but in the final submission of the case are only to be considered as they may have affected the question of his credibility. Feeherty v. Sullivan, Mo.App., 129 S.W.2d 926; Partney v. Agers, 238 Mo.App. 764, 187 S. W.2d 743.

In this instance Haney's final and therefore actual account of the occurrence was that Brown gave him the "stop" signal, not when the locomotive was 75, or 40, or even 25 feet from the crossing, but at a time when the locomotive was not more than 4 or 5 feet from the crossing. Brown's own testimony, as we have already shown, was that when he gave the "stop" signal, the front bumper of the automobile was at the edge of the ties of the track upon which the collision occurred, and the locomotive was practically at the crossing. Such a state of facts would not have entitled plaintiff to recover upon any theory of liability, and least of all upon the theory of willful and wanton misconduct in the respect submitted by the instruction.

It follows that for the error in the giving of instruction No. 1, the judgment of the circuit court should be reversed and the cause remanded. It is so ordered.

ANDERSON, J., and BROADDUS, Special Judge, concur.