Max Johnson and The Pullman Company, a Corporation, v. Terminal Railroad Association of St. Louis, a Corporation, Appellant.—No. 39471.—191 S. W. (2d) 676.

Division One, December 3, 1945.

Rehearing Denied, January 7, 1946.

Warner Fuller and Arnot L. Sheppard for appellant.

*Henry A. Freytag* and *Chelsea O. Inman* for respondents.

804

■ DALTON, C.—Action for damages for personal injuries alleged to have been occasioned by the negligence of the defendant. The cause was submitted solely under the humanitarian doctrine and a verdict returned for plaintiff for $12,500. Judgment was entered on the verdict and defendant has appealed.

Max Johnson, hereinafter referred to as respondent, had been employed by The Pullman Company, as an electrician and maintenance man, for about six years. He was injured February 14, 1939, about 10:15 A. M., while working in appellant's Rankin Avenue passenger car storage yards. He had placed a 14 foot ladder against the side of a pullman car and was on this ladder installing an exhaust fan in the top of the car, when he heard an engine and several cars couple to a pullman car standing 50 to 60 feet east of him on an adjoining track. He looked and saw this car being pushed further west on the same track. Respondent's ladder fouled this adjoining track and, before he could descend to the ground, ■ the ladder was struck and knocked down by the passing cars. Respondent jumped or fell from the ladder and was injured. As a result of his injuries The Pullman Company paid him $528.00 compensation benefits under the Missouri Workmen's Compensation law and paid, on his behalf, the sum of $380.47 for medical and hospital care and attention. The Pullman Company alleged that, it was subrogated to his rights to the extent of the $908.47 so paid, and joined as party plaintiff to obtain reimbursement out of any recovery of damages.

Appellant's railroad tracks, in that part of the Rankin Avenue yard where respondent was working, ran east and west. They were numbered from north to south and were straight for six or more car lengths. Between each set of two tracks there was a concrete platform and between each of the other two tracks there was a cinder

platform. Respondent had placed his ladder in the cinder platform on the north side of track 7, within 12 to 14 inches of the south rail of track 6, and had leaned it against the north side of the pullman car. Respondent moved the ladder and replaced it once to let another employee wash the car and he did not know for certain that the ladder fouled the adjoining track, since it leaned away from that track. The distance between the tracks (rail to rail) was about 8 feet and the overhang of the cars was about 2 feet and 4 inches.

When respondent heard the coupling made to the east end of the pullman car on the adjoining track he looked east over his shoulder and saw the engine and two or three cars pushing the other car toward him. No switchman or member of the train crew had notified respondent that they were going to move cars on track 6. Respondent had heard no bell or whistle. When respondent looked, he saw that no one was riding on the steps at the west end of this cut of cars, as it approached, and no one was walking from the east to the west end of the forward car. He was afraid to leave the fan partly installed, lest it fall on him as he went down the ladder, so he pulled it out and started down to get in the clear. He was about half way down, when the steps or side of the approaching pullman car struck the ladder and pushed it over toward the west. Respondent fell to the ground and landed on his back in the cinder path between the tracks. The cut of cars was moving west at a speed of from one to three miles per hour and, at that speed, a switchman, could have had the cars stopped within 4 or 5 feet by giving the engineer a "stop" signal with his hand.

It was admitted that appellant's employees were in charge of the engine and cars moving on track 6, when respondent was injured. Other facts will be stated in the course of the opinion.

Appellant contends that respondent "failed to make a submissible humanitarian case"; that respondent's principal instruction was erroneous; that incompetent evidence was admitted and prejudicial argument permitted over objection; and that the verdict was grossly excessive.

On the first proposition, respondent insists (1) that respondent's injury occurred in appellant's switchyard, where it was respondent's duty to look out for his own safety and where appellant was entitled to expect a clear track; (2) that the evidence was insufficient to show a definite, certain, uniform and universal custom and practice to look out for the employees of The Pullman Company, to warn them and to exercise reasonable care to keep from injuring them; (3) that respondent "did not rely upon the observance of any such alleged custom"; (4) that the evidence showed "conclusively that respondent's gross negligence was the sole cause of his injuries"; and (5) that the respondent "failed to prove that any (one) of appellant's

employees was in a position to discover his danger'' or had the ''ability at that time to stop the train.''

Respondent alleged that appellant's said yard and tracks were ''used openly, continuously and notoriously by many persons, including employees, of the Pullman Company, all of which defendant knew, and it was the uniform practice and custom and the duty of defendant to look out for such persons and to warn them and to exercise reasonable care to keep from injuring such persons.'' Respondent's principal instruction required the jury to find ''that on February 4th, 1939, and long prior thereto, it was the uniform practice and custom of defendant, when moving cars upon the tracks mentioned in the evidence, to look out for employees of The Pullman Company and other persons whose duties required them to work on or about said tracks for the purpose of protecting them from injury by the movement of cars on said tracks, and that Max Johnson knew of and relied on said custom at the time herein referred to; . . . and that the employees of defendant engaged in moving said car or cars westwardly saw and knew, or by the exercise of ordinary care on their part to keep a lookout would have seen and known, that Max Johnson was in such position of imminent peril, and that said employees of the defendant could thereafter, by the exercise of ordinary care, with the means and appliances at hand, have stopped said car or cars and thus and thereby have avoided injuring said Max Johnson . . . ''

Respondent testified that, on all occasions that he had had occasion to observe, switchmen would ride on the head end of a cut of cars being moved in, and that ''they would holler and whistle, make a noise, or anything else, to let you know to get in the clear when they were backing in as this train.'' That he had seen trains stop on numerous occasions for hose stretched across the track, or to remove ice boards from the track. Respondent had observed this custom of looking out and having a lookout stationed on the cars to notify the men and stopping the cars, if necessary, all of the time he worked in the Rankin yards. ''As they usually back in, they are standing where they can see the whole thing and they give us an opportunity to get out of the way, or slow down, or give us a chance, for sometimes we have a cable over the rails and things of that effect, that would be almost impossible to blue flag a train for a cable over the rail, just using it momentarily, and they will always come up and tell us to watch our cable or whatever we might have, as they walk by the train.'' ''Well, in any kind of work we were doing they always told us, . . . they came by and told us they would be in there at a certain time, or if we were working on the track adjoining as to about what time they would move it.'' ''The train crews make it their business for the man on the back of the train to stop if they see it is impossible for us to get out of the way.'' That it was the

practice for a man to ride the forward end of a cut of cars, ''or else walk along the train until he had a clear view of the track.''

Before beginning his work of removing the fan from the pullman car, respondent had placed a blue flag on track 7 at the east and west end of the train upon which he was working. Respondent testified that the blue flag rule only applied to the one track where an employee was working; that he ''had no instructions to flag two tracks to work on one,'' or to flag a track adjoining the one on which he was working; that he had no instruction ''to notify somebody if you were going to put a ladder too close to an adjoining track''; that he was not permitted to flag a track, other than the one on which the car, he was working on, was standing; that he would not have been able to answer for a flag on track 6; that he was instructed to use blue flags when working underneath a car or where he would not be seen; that, if he had put his ladder in the center of track 6, he would not have been required to blue flag track 6, but he would have reported to his foreman; that he ''had instructions never to block a lead with a blue flag''; and that, if he had put a flag a car length ahead this car (on the adjoining track), then he would have blocked the lead. Respondent further testified that he did not know that track 6 could not be used without hitting his ladder, but that, if he had been positive the ladder fouled track 6, it would have been his duty to go and report to his foreman. He did not blue flag track 6 nor report to his foreman.

Appellant's witness, A. K. Casper, testified on cross-examination, as follows: ''Q. Mr. Casper, up until the time Johnson was hurt you fellows working about the cars there expected Terminal employees to warn you if you were in danger, didn't you? A. Yes, sir. Q. And they always had done that, hadn't they? A. It has been customary. Q. It has been customary. And these switchmen bringing cars into these tracks, they knew you fellows would be there, didn't they? A. Yes, sir. Q. And they would look out for you, wouldn't they? They ——. A. They did; that is the general practice. Q. They didn't run the trains in there blind without regard to anybody's safety, did they? A. No, sir. Q. They kept a lookout? A. Yes, sir. Q. And they warned you and stopped the train, if necessary, to keep from hurting a man? A. Yes, sir.''

Respondent's witness Richard E. Reed, who was appellant's switch crew foreman, a member of the train crew that moved the car on track 6, testified: ''Q. Well, a good many employees worked on these tracks and on or about the cars? A. Yes, sir. Q. That is, not only the employees of the Terminal, but employees of The Pullman Company and others? A. That's right. Q. You could expect them there any time of the day or night, could you? A. Well, usually, yes. .. .. . Q. Well, you always ride on the preceding end of cars you are pushing into the yards? A. Yes. . . . Q.

Whether it is a written rule or not you know it is a custom, because you always did it? A. Yes, sir. Q. Then you coupled onto this car that was standing there? A. Yes, sir. Q. Then you immediately shoved on west, didn't you? A. Well, I made this coupling and stopped and walked back to the west end of the car that was standing in there. . . . Q. So, you were on the west end, or the preceding end, of those cars when the second movement was made onto No. 6. A. Yes, sir. . . . Q. At least, you always get up to the preceding end of the car where you can keep a lookout, don't you? A. Yes, sir. Q. And sometimes you ride the car and sometimes you don't? A. That's right.'' Reed did not see respondent or his ladder and he testified, ''Well, he must not have been there. If he had been in view, I would have seen him.'' There was evidence that a switchman going to the west end of the cut of cars, after the pullman car on track 6 had been added, ''would have been bound'' to see respondent's ladder, if he had looked west down the straight track.

Bose Honeycutt, a car washer for The Pullman Company, testified as follows: ''Q. Now, you fellows washed the cars and cleaned the cars and repaired the cars in that yard every day, didn't you? A. Yes, sir. Q. On those tracks? A. Yes, sir. Q. So, every day some of you Pullman employees were working on and about those cars? A. Yes, sir. Q. And that has been going on for many years, hasn't it? A. Yes, sir.'' He further testified that he had observed appellant's employees switching in the yards; that, when cars were being pushed, he usually saw a man on the rear end of the cars; that, after a coupling was made, the switchman ''usually comes down to the last,'' and usually stands on the outside and flags them on down; and that he had seen them stop where some employee had a hose across on an adjoining track or a ladder too close and they would flag the train down and stop it. He further testified: ''Q. Prior to Johnson's accident did you ever have instructions to flag the track next to the one on which the cars were standing that you were working on? A. No, sir. Q. You never did that? A. No, sir. Q. You only flagged the track on which the car was standing that you were working on? A. Yes, sir. . . . Q. What was the practice and custom on the part of the switchmen of the Terminal about keeping a lookout ahead when they are shoving cars in there? A. Well, I always see them, when they shove a car, they would walk around to the rear of the car and get on; walk alongside of it and flag him on down.''

Did the evidence show a ''definite, certain, uniform and universal'' custom to keep a lookout for employees of The Pullman Company, or merely that a switchman usually rode ''the leading or preceding end of a cut of cars'' in order to make couplings, open switches or signal for a stop? Without proof of such custom, and in the absence of a blue flag, appellant insists that it could expect a clear

track and respondent had to look out for his own safety. Mayfield v. Kansas City Southern R. Co., 337 Mo. 79, 85 S. W. (2d) 116. It will not be necessary to review the testimony further than to say that respondent was not a switchman, section-hand, or even an employee of appellant, but he was engaged with other employees of The Pullman Company in repairing and cleaning pullman cars in appellant's passenger car storage yard. He had been so engaged over a long period. Appellant was bound to anticipate the presence of respondent and other workmen. Considered favorably to respondent, the evidence was sufficient to show a uniform custom and practice to keep a "lookout for" the Pullman Company employees for the purpose of protecting them from injury by car movements. Mooney v. Terminal R. Ass'n. of St. Louis, 352 Mo. 245, 176 S. W. (2d) 605, 610. If the jury found the existence of the custom, as submitted in respondent's instruction, ▮▮▮ then there was a continuing duty on appellant to keep a lookout at all times in said yards for Pullman employees.

▮▮ Did respondent "rely upon the observance of any such alleged custom?" Appellant argues that respondent knew track 6 was not blue flagged and, the moment he heard the coupling, he started down the ladder to get in the clear. Respondent testified concerning the existence of the custom; that he thought his ladder could be seen; that he depended on the custom and practice mentioned, and "figured, if they came in the yard, they would sound the bell or the whistle," or the man riding on the rear end of the train would holler and let him know it was coming, and he would have ample time to get out of the way. The evidence further shows that respondent did not start down the ladder until after he observed that no lookout was being kept. The evidence is sufficient to show reliance on the custom.

▮▮ Was respondent's negligence the sole cause of his injuries? Appellant argues that respondent was negligent in not blue flagging track 6, in not reporting to his foreman, in not keeping a lookout for his own safety, in not complying with the safety rules of The Pullman Company, and in placing his ladder too close to track 6; and that such negligence was the sole cause of his injuries. We have held that there was sufficient evidence of the pleaded custom and of respondent's reliance thereon to make an issue of fact for the jury. The matter of sole proximate cause was for the jury and appellant's contention that "the evidence shows conclusively the respondent's gross negligence was the sole cause of his injuries" must be overruled.

▮▮ Appellant further contends that "switch foreman Reed was the only employee of appellant mentioned in the record as being near the point of accident"; that there is no evidence that Reed saw the ladder or respondent before respondent was injured; that respondent cannot rely upon Reed's testimony to prove Reed's presence there, since respondent testified that no one was on the preceding end of the

cut of cars or walking beside it; and that, since "at the time respondent's position became perilous," appellant had no employee in a position to discover respondent's perilous position, or to act to stop the train, no case was made under the humanitarian doctrine. Appellant argues that "if there is no representative of defendant present who is in a position to discover the danger of plaintiff, at the very moment the (humanitarian) doctrine begins to operate, then obviously there can be no liability based upon that doctrine, because there can be no discovery, actual or constructive, of plaintiff's peril"; and that a failure to have a man in position to discover the peril, or to act or signal to stop the train, "cannot possibly constitute anything more than primary negligence." Appellant cites Mayfield v. Kansas City Southern R. Co., supra (85 S. W. (2d) 116, 123); Zickefoose v. Thompson, 347 Mo. 579, 148 S. W. (2d) 784, 791; Hutchison v, Thompson (Mo. App.), 167 S. W. (2d) 96, 103. We find nothing in these cases requiring a showing of the presence of an employee who could and should have seen and could have acted before imposing liability for *discoverable* peril under the humanitarian doctrine where a duty to keep a lookout exists.

If the uniform custom and practice to keep a lookout for Pullman employees was shown by the evidence and found by the jury, it was wholly immaterial that the proof failed to show appellant had an employee in a position to see respondent's perilous position, when it arose, provided the proof showed that the employee, had he been in such position at that time, would have had the ability to avoid the injury after he discovered or should have discovered respondent's peril. This court has, long since, extended the humanitarian doctrine to discoverable peril in those cases where the defendant is under a continuing duty to keep a lookout and the mere fact that appellant may not have had an employee *so situated* that he could have timely discovered respondent's peril and acted to stop the cut of cars is of no consequence. Morgan v. Wabash R. Co., 159 Mo. 262, 60 S. W. 195; Mayfield v. Kansas City Southern R. Co., supra; Krause v. Pitcairn, 350 Mo. 339, 167 S. W. (2d) 74; Clark v. Terminal R. Ass'n. of St. Louis (Mo. App.), 111 S. W. (2d) 168, 171; Womack v. Missouri Pacific R. Co., 337 Mo. 160, 88 S. W. (2d) 368, 370. If the lookout had been maintained, the evidence shows the cars could have been stopped within a few feet after respondent came into imminent peril and after he and his ladder were in plain view of the preceding or forward end of the moving cars.

Appellant further contends that respondent's principal instruction was erroneous because (1) it was unsupported by evidence in that there was no proof "that Reed saw or could have seen respondent's perilous position in time to have stopped the train and avoided the accident"; (2) it did not require the jury to find that the custom relied on was violated; (3) it assumed a violation of the

custom and, on that assumption required the jury to find only that had a lookout been kept Johnson's perilous position would have been discovered; (4) it broadened the issues made by the evidence and gave a roving commission to the jury to find for respondent "on the hypothesis that any one or more of appellant's employees would have seen respondent's perilous position had he or they been keeping a lookout"; and (5) it did not limit appellant's responsibilities to the acts of Reed.

The first ground is based upon the theory "that respondent failed to make a submissible humanitarian doctrine case," because respondent testified that Reed was not on the forward end of the cars or approaching it and because there was no proof (available to respondent) that Reed or any other employee was present and saw or could have seen respondent's perilous position. We have ruled that the evidence was sufficient to make a case under the humanitarian doctrine. The fifth ground likewise is without merit in contending that appellant's liability was limited to the acts of switch foreman Reed and that the instruction should have so stated. In view of the extension of the humanitarian doctrine to discoverable peril, where a duty to keep a lookout exists, the instruction was not broader than the pleadings and proof and it did not give the jury a roving commission.

While the instruction "nowhere requires the jury to find that the custom relied upon by respondent was violated," respondent's cause of action was not based upon primary negligence for a violation of the alleged custom, but rather upon discoverable peril under the humanitarian doctrine. Failure to keep a lookout was not, of itself, a substantive part of respondent's cause of action. Clark v. Terminal R. Ass'n. of St. Louis (supra), 111 S. W. (2d) 168, 171. The instruction did require a finding, as a condition precedent to a finding for respondent, that "the employees of defendant engaged in moving said car or cars westwardly saw or knew, or by the exercise of ordinary care on their part to keep a lookout would have seen and known, that Max Johnson was in a position of imminent peril." This was sufficient, and by doing so the instruction did not assume that a lookout was kept. The question was not whether a lookout was kept, but whether, if one had been kept, respondent's peril could have been discovered and the injury could have been avoided. Mayfield v. Kansas City Southern R. Co., supra.

We have carefully reviewed the several assignments of error having to do with the admission of alleged incompetent and prejudicial evidence, towit, (1) in permitting respondent to subsequently explain an answer made to a question on cross examination, which answer appellant contends left no room for interpretation; (2) in refusing to strike an answer to a question as not responsive and as being argumentative; (3) in permitting a witness to answer a question over the objection, that it called for a conclusion and asked for

an opinion upon a question not involved in the case "except if it might become a jury question," where the question was somewhat amended before it was answered and no further objection was made to the new question or to the answer; and (4) in permitting a witness to answer a question and give a conclusion, although the entire answer was thereupon stricken out on motion as argumentative and not responsive. No prejudicial or reversible error appears in these rulings.

We have examined the alleged erroneous rulings made during the argument of respondent's counsel, towit, (1) in refusing to rebuke counsel for argument attempting to discredit one of appellant's witnesses for taking a statement from respondent for The Pullman Company on the day respondent was injured and to discredit the alleged statement of respondent which was offered by appellant; and (2) in permitting counsel to argue that the testimony of one of his own witnesses, an employee of appellant, was not to be believed in a particular respect, towit, that he walked down and got on the forward end of the cut of cars and was riding there and didn't see Johnson or the ladder. We find no reversible error in the matters complained of. The court acted within its discretion and no abuse of that discretion appears. Cordray v. City of Brookfield (Mo. Sup.), 88 S. W. (2d) 161, 165.

Was the verdict excessive? Respondent was 35 years of age at the time he was injured. He sustained a comminuted fracture of the right heel bone, a compressed fracture of the second lumbar vertebra, a surface fracture of the upper margin of the first lumbar vertebra and abrasions and contusions of both hands. At the hospital, he was kept on a fracture frame a few days. A convex swing and sand bags were used to secure extension of his back. After a few days, his body was put in a plaster of paris cast, from his arm pits down, and his right leg was put in a cast. The cast was kept on his body for about nine weeks and on his right leg for seven or eight weeks. He wore a brace for his back for approximately eighteen months and still wears it in driving a car or on making long trips. While in the hospital, he suffered much pain from his injuries. His back still hurts when he lifts or does heavy work or stretches up and twists. Overhead work bothers him, much more than normal front work. He has a permanent deformity of the spine and his heel hurts and gets sore and stiff on use. He was in the hospital from February 4th to April 26th, 1939. He lost about six months wages. When he returned to work, he was given work as a supervisor and instructor. He was and is unable to do any heavy work. While at the time of his injury he was receiving approximately $150.00 per month and at the time of the trial he was receiving an average of $210.00 per month, the evidence showed that this was due to special conditions and to working six days per week, with overtime, and working on many days he did not feel like working.

814

■

■ Appellant has cited no cases and we find none where the injuries and damages resulting are closely similar. Appellant points to respondent's ability to work and his increased earnings as evidence that the verdict is excessive. Increased earnings, in view of the circumstances shown, do not necessarily control the amount of damages to which respondent may be entitled. Kleinlein v. Foskin, 321 Mo. 887, 13 S. W. (2d) 648, 657; Maier v. American Car and Foundry Co. (Mo. App.), 296 S. W. 212. It was for the jury to determine the extent and permanency of respondent's injuries and the amount to be assessed therefor. An appellate court should not interfere unless the award is grossly excessive. Baker v. C. B. & Q. R. Co., 327 Mo. 986, 39 S. W. (2d) 535. In this case there is substantial evidence to support the amount of the verdict.

The judgment is affirmed. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.