229 S.W.2d 285 (1950)
MOEHLE
v.
ST. LOUIS PUBLIC SERVICE CO.
No. 27808.
St. Louis Court of Appeals. Missouri.
April 18, 1950.
Motion for Rehearing or for Transfer to Denied May 19, 1950.
*286 Salkey & Jones, St. Louis, Carroll J. Donohue, St. Louis, Sam Elson, St. Louis, for appellant.
Paul H. Koenig, St. Louis, William L. Mason, Jr., St. Louis, for respondent.
Motion for Rehearing or for Transfer to Supreme Court Denied May 19, 1950.
McCULLEN, Judge.
This suit was brought by respondent, as plaintiff, against appellant, as defendant, to recover damages for personal injuries alleged to have been sustained by plaintiff on March 4, 1948, as a result of negligence of defendant when plaintiff was alighting from a bus operated by defendant. A trial before the court and a jury resulted in a verdict for plaintiff against defendant in the sum of $10,000.00. The amount of the verdict was reduced to $6,000.00 by a remittitur entered by plaintiff in response to an order of the court. When plaintiff filed said remittitur the court overruled defendant's motion for a new trial and defendant duly appealed.
Plaintiff alleged in her petition that on March 4, 1948, she was a passenger for hire on a bus operated by defendant and that as she attempted to alight from the bus at Seventh and Locust Streets in the City of St. Louis, the regular stopping place for said bus, the bus gave a sudden violent and unusual jerk and jar directly due to the negligence of defendant and directly caused plaintiff to sustain serious, painful and permanent injuries to her person.
The petition recited at length the injuries alleged to have been sustained by plaintiff and included allegations that approximately one year prior to March 4, 1948, plaintiff had undergone a major surgical operation for correction of a condition of her abdomen and abdominal viscera and particularly the colon thereof; that directly due to the injuries sustained by her when alighting from defendant's bus the condition for which she underwent said operation was reactivated. The petition prayed damages in the sum of $10,000.00.
The answer of defendant, after admitting that it was engaged in business in the City of St. Louis as a common carrier of passengers for hire by means of motor buses, consisted of a general denial of the allegations of plaintiff's petition.
Plaintiff testified that she was 36 years old, unmarried, and that prior to March 4, 1948, was employed as a stenographer by Joe Brown Company in the Railway Exchange Building in St. Louis; that on the morning of March 4, 1948, she came downtown from her home on a Lindenwood bus operated by defendant; that when the bus got to Seventh and Locust Streets, at about 9:15 A.M., it came to a stop and several persons got off ahead of plaintiff; that while she was in the process of stepping down the two steps of the rear exit door of the bus and while her left foot was on the upper step and her right foot on the lower step the bus started to roll and then suddenly gave a jerk, and plaintiff was thrown forward and thrown out of the bus.
Plaintiff further testified that several people got off the bus after she fell; that one of them was a lady who helped her up; that she did not ask the lady's name; that she went back on the bus through the same door from which she had alighted and reported the incident to the driver of the bus, giving him her name and address; that she did not learn the name or badge number of the driver; that after she had been helped to her feet by the lady above mentioned *287 she noticed "that the urine had run from me, my bladder had given way and the urine had run all over me and my clothes and everything."
Further testifying plaintiff stated that she went on to work and remained there for the balance of the working day; that she called Dr. Nicholas S. Vitale that evening, but he could not see her until the following day, but the doctor prescribed hot Sitz baths and a sedative; that she saw the doctor at his office the following day; that he manipulated her coccyx and later took X-rays of that portion of her body; that he prescribed the application of heat to her back.
Further testimony by plaintiff was that at first she visited the doctor three times a week, but the number of visits was gradually reduced to one a month. The doctor gave her diathermy treatments at his office. Plaintiff stated that the pain in her back is bad if she sits or stands for long periods or if the weather changes; that it is bad if she exerts herself and also if she has a bowel movement; that the pain is an aching pain; that she had a sprained wrist as a result of the accident, but that it was not serious; that she had had no previous injury to her coccyx.
Plaintiff further testified that at the time of the trial she was taking heat diathermy treatments once a month and was still taking Sitz baths. Plaintiff explained that the diathermy treatment is "a machine with an attachment and it has a sort of metal plate that fits under your back and one that fits on top of your stomach. * * * It sends heat back and forth between these two plates." She stated that the nervous condition has existed since the accident. Plaintiff testified that in March 1947 she was operated on for a major operation in her pelvic region and that for several months after the operation she experienced nervousness, but that it had subsided before the time she was injured in connection with defendant's bus.
Plaintiff called as a witness in her behalf Dr. Nicholas Stephen Vitale who testified that he had performed an abdominal operation on plaintiff in 1947; that on the evening of March 4, 1948, plaintiff called him on the phone and told him that she had been injured; that he prescribed some pain capsules; that plaintiff came to his office the following day and on examination he found that she was suffering from bruises on both hands, sprained left wrist, swelling and tenderness of her lower back, exquisite pain and tenderness on palpation of the coccyx. The doctor explained the meaning of the word "exquisite" by saying "It means to us on the slightest touch of a part the patient will flinch or jump with pain." The doctor fluoroscoped plaintiff and gave her diathermy treatment. The fluoroscope revealed what the doctor called "a suspicious displacement of the tail bone which was confirmed on manipulation with my finger in the rectum"; that the manipulation was painful to plaintiff.
Dr Vitale prescribed rest and sedatives for plaintiff, and on March 15, 1948, took an X-ray of her which was introduced as plaintiff's exhibit A. He testified that the X-ray revealed displacement of the coccyx to the left which indicated to him a tearing of the ligaments on one side and, therefore, the tail bone had no support on one side because it was pulled over by the ligaments on the other side.
The doctor testified that plaintiff remained under his treatment and care up to and including the time of the trial; that he had been giving plaintiff diathermy treatment and periodic manipulation of the tail bone but had not been able to get the coccyx bone or tail bone back in alignment. The doctor said that an injury would be necessary to cause a displacement of the tail bone such as he saw in this case. He stated that his bill for services was $155.00; that plaintiff's condition was permanent and progressive as to pain.
On cross-examination Dr. Vitale testified that the coccyx has no functional use and no central nerve centers; that people's tail bones at times are angulated in various directions and slight deviations are sometimes not painful, if congenital; that the X-ray in this case showed a deviation and fracture in the structure of plaintiff's tail bone and that the ligaments on one side were torn; that he could not actually see a *288 fracture but suspected there was one on the basis of the bone formation; that this could be due to several possible causes; that ordinarily a tail bone can be manipulated without pain; that the pain in this case will be progressive because the tearing of the ligaments will cause neuritis or irritation of the nerves to the coccyx. In this connection the doctor testified:
"Q. And that situation is not going to get any better, nature won't remedy it in time, so there will not be pain there? A. Not unless you move the coccyx. You will have a painful coccyx, coccydynia, due to neuritis there."
The doctor further stated that removal of the coccyx would not remove a functional organ from the body, although such an operation sometimes does not eliminate the pain; that he had never seen a recovery from a coccydynia except when the coccyx was removed; that plaintiff's reflexes were overactive; that he reached this conclusion on the basis of the knee-tapping test but made no other tests and did not notice any objective signs of nervousness on plaintiff's part.
Dr. Kilian Fritsch testified on behalf of plaintiff that he specialized in orthopedic or bone and joint surgery; that the day before the trial he examined plaintiff and found her coccyx rigid and stiff; that it felt deformed to palpation and plaintiff complained of pain; that he found no sciatica and no disturbance of her lower extremities; that his diagnosis was painful coccyx; that plaintiff's condition without surgery will probably remain the same, will not get worse and might get better; that plaintiff's exhibit A, the X-ray of plaintiff's coccyx, was not adequate to view the coccyx; that there is an arthritic process which could be the result of trauma in the joint which ties the tail bone on to the sacrum; that the X-ray was "not too good a picture" and does not reveal how much displacement, if any, there is; that plaintiff's sacro-iliac is normal and there is no other arthritis in her back; that the X-ray reveals a little deviation in the coccyx which may be the result of trauma or may be congenital; that he could not tell what caused the deviation; that plaintiff's condition is probably not progressive but that his recommendation would be that plaintiff have her coccyx removed because after treatment for a year she continues to complain of pain.
Thomas Higgins testified on behalf of defendant that he had been in the employ of defendant the last 25 years as a schedule maker. He identified defendant's exhibit I as the schedule in effect on March 4, 1948, covering Lindenwood eastbound buses of defendant. He stated that according to said schedule various runs were due to arrive at Seventh and Locust Streets as follows: 9:02 A.M., 9:05 A.M., 9:07 A.M., 9:10 A.M., 9:13 A.M., 9:17 A.M., 9:20 A.M., 9:24 A.M., 9:27 A.M., and 9:30 A.M.
The witness also identified defendant's exhibits Nos. 2 to 12 as report cards for each of the above mentioned runs and testified that no cards showed any deviation from the schedule although it would have been shown had there been a deviation.
Eleven different bus drivers in the employ of defendant testified with respect to the various runs shown in the schedule above referred to. Their testimony covered the time of the arrival of their respective buses of the Lindenwood line at the corner of Seventh and Locust Streets on the morning in question between 9 A.M. and 9:30 A.M. Each of said witnesses testified that he had no recollection of any unusual occurrence in connection with the bus he was operating on said morning at the times mentioned; that if any accident had happened or been reported to him he would have reported it to the company.
Dr. Olney A. Ambrose testified on behalf of defendant that he examined plaintiff on February 28, 1949; that she complained of discomfort at the end of her spine and in her back as well as in her left wrist; that she also complained of nervousness; that he found no visible injury to the wrist; that he examined the coccyx through the rectum and found that it was not displaced, not out of normal position and not movable; that all tests of the nervous system showed normal; that he took X-rays of her back and *289 the coccyx, which must be taken from side to side, and these revealed no displacement or fracture; that if plaintiff had been injured, it had been so perfectly repaired that no line of fracture or displacement could be seen by X-ray. Defendant's exhibits 14 and 15 were introduced in evidence and Dr. Ambrose testified that they were X-rays of plaintiff's coccyx which revealed it to be normal both at the tip and at the point where it is attached to the flat bone; that no deformity of the tail bone was revealed by palpation either in the coccyx or in the bottom of the sacrum; that this conclusion was confirmed by the X-rays; that neurological tests which he gave plaintiff indicated no organic neurosis.
Dr. Ambrose further testified that there are no nerve centers in the coccyx but there are nerve fibers coming down on either side; that he gave plaintiff thorough reflex tests and found no evidence of disease or injury to the nervous system; that the knee-tapping test is only one of neurological tests.
On cross-examination Dr. Ambrose testified that there could have been a fracture in plaintiff's coccyx which might have disappeared; that there are many nerves running along the side of the coccyx and it would be painful if one of these were caught in a fracture; that such involvement would not show on an X-ray; that doctors have to depend on the patient's statements as to whether or not there is pain down there; that if there had been a fracture with displacement or with extra callus it would show on an X-ray, but after a certain length of time a fracture with no displacement may not show because nature had repaired it; that a coccyx is surrounded by nerves and a movement or deviation of the coccyx can catch one of those nerves; that the coccyx is always rigid in a person of 35 or 40 years of age and a rigid coccyx in a woman 36 years of age is not a deformity but rather is normal; that pain would not be caused by rigidity but would be from some nerve irritation; that if ligaments which do not show on an X-ray, are torn off the side of the coccyx, there will be permanent soreness but a coccyx is not usually hurt that way but rather is displaced, dislocated or broken.
Dr. Ambrose testified that his examination revealed nothing which in his opinion would cause plaintiff to have a permanent injury.
Plaintiff testified in rebuttal and identified a man sitting in the courtroom as the driver of the bus from which she was alighting when she was injured. Ora Keightley, the man so identified by plaintiff, testified that no woman had reported an accident to him on the morning in question; that he would not move a bus until a full report of an accident had been taken because that is the company's standard procedure.
Defendant contends that the court erred in submitting plaintiff's case to the jury under the "res ipsa loquitur" doctrine. Defendant argues that plaintiff's evidence showed the specific negligence which caused her injury and that she was, therefore, not entitled to the benefit of the res ipsa loquitur doctrine. In support of this contention defendant cites a number of cases but relies most heavily on the case of Hoeller v. St. Louis Public Service Co., Mo.App., 199 S.W.2d 7, 12. The Hoeller case was decided by this court in 1947, and it must be conceded that at first glance it appears to be analogous to the case at bar. A careful analysis of the evidence in both cases, however, discloses a clear difference that makes the Hoeller case inapplicable to this case. In the case at bar the exact testimony of plaintiff, in describing the incident out of which her injuries arose, was: "Yes, sir, it was nine-fifteen in the morning when I arrived at Seventh and Locust, and I was in the process of stepping down, there were two steps on the bus, and I first put my left foot went on the first step down, my right foot on the next step, which was the last step down, and while I was stepping down the bus started to roll as if he had released the brake, and then suddenly it gave a jerk as though he applied the brake again, and at that particular time, my right foot caught on the metal part of the step, on the lower step, and I was thrown forward, thrown out of the bus." (Emphasis ours.)
*290 In the Hoeller case, supra, relied on by defendant, the daughter of plaintiff therein testified:
"Q. And do you know what happened? Did the motorman put the brakes on suddenly? A. He did.
"Q. He put the brakes on real suddenly? A. Very suddenly just as he reached Utah Street.

* * * * * *
"Q. And the brakes were suddenly jammed on? A. That's right." Hoeller v. St. Louis Public Service Co., Mo.App., 199 S.W.2d 7, 12. (Emphasis ours.)
In the Hoeller case the testimony quoted above showed specifically and positively what caused the accident. In the case at bar plaintiff's testimony did not show what was the cause of the accident. Plaintiff herein used the words "as if" and "as though" which show clearly that she herself did not actually know what caused the accident. It is obvious that plaintiff did not know the specific cause of the accident. She was alighting from the rear of the motionless bus when it rolled and jerked. She, therefore, could not know what the driver was doing at the front of the bus. Her testimony showed no more knowledge of the specific cause of the accident than if she had said that the accident occurred "as if" or "as though" the bus had bumped into a solid stone wall. Plaintiff's entire testimony on this precise point makes it clear that she was not attempting to tell what actually was the specific cause of the accident. The words "as if" and "as though" indicate that she did not know the cause of the accident and merely used those words for descriptive and illustrative purposes. She did not testify to any facts showing the specific negligence which caused her injury.
Neither the Hoeller case nor any of the other cases cited on this point by defendant would authorize us to hold that plaintiff herein was deprived of her right to have her case submitted on the res ipsa loquitur doctrine, because the facts in said cases are not similar to those in the case at bar. We rule against defendant on this point.
Defendant next contends that instruction No. 2 given on behalf of plaintiff was erroneous and prejudicial because it improperly defined the doctrine of res ipsa loquitur and constituted in effect an instruction that defendant was an insurer of plaintiff's safety and that it also shifted the burden of proof to defendant.
The instruction complained of after telling the jury that if they found that plaintiff was a passenger on defendant's bus, and started to alight at a regular stopping place while the bus was motionless, and that the bus moved with a sudden jerk causing plaintiff to trip or stumble on a step of the bus and to fall, went on and stated: "* * * then you are instructed that such facts, if you believe them to be true, are sufficient evidence to warrant a finding by you that the defendant was negligent, and you may so find, unless you find and believe from other facts in evidence (if any) that the occurrence was not due to any negligence on the part of the defendant; and if you do find and believe from all of the evidence in the case that the defendant was negligent, and that the plaintiff suffered injuries to her person, directly due to such negligence, then your verdict should be for the plaintiff and against the defendant."
Defendant contends that the omission of the word "circumstantial" from the above instruction renders the instruction reversibly prejudicial; that the jury could reasonably interpret the instruction to mean that the moment they believed plaintiff's testimony about the sudden jerk of the bus they were thereby justified in believing defendant was guilty of negligence unless the defendant had other explanatory and exculpatory evidence. Defendant argues that the jury should have been told that even if they found the fact of an unusual jerk, although they could infer negligence from that finding, they were not compelled to do so. The instruction contained no language whatsoever that could be construed to mean that the jury "should" or "must" find defendant negligent from the finding of the facts hypothesized. If defendant wished *291 to have the idea of compulsion specifically negatived it should have asked for an instruction on that point. Having failed to make such request it cannot complain on that point now.
In Harke v. Haase, infra, our Supreme Court, through Commissioner Hyde, now Chief Justice of that court, in an effort to remove some of the fog and uncertainty that had surrounded the doctrine of res ipsa loquitur, as evidenced by many conflicting contentions of counsel and decisions of courts, said: "What is a res ipsa loquitur case anyhow? Reduced to simple terms, does it not merely mean that negligence can be proved by circumstantial evidence and that certain circumstances, as to the character of an accident, are sufficient to take the case to the jury?" Harke v. Haase, 335 Mo. 1104, 1110, 75 S.W.2d 1001, 1003.
The court then went on and made suggestions for a proper form of instruction as a substitute for the erroneous instruction that had been given on behalf of plaintiff in that case wherein the jury had been told that if they found certain facts hypothesized therein, then there was a presumption of negligence on the part of defendant and that the verdict should be in favor of plaintiff and against defendant, and that the burden of proof was cast upon the defendant to overcome such presumption by a preponderance of the evidence. The language of the instruction suggested by Judge Hyde in that case which was to follow after hypothesizing the facts, was: "Then you are instructed that such facts (if you believe them to be true) are sufficient circumstantial evidence to warrant a finding by you that the defendant was negligent, and you may so find, unless you find and believe from other facts and circumstances in evidence that the occurrence was not due to the defendant's negligence, and if you do find and believe from all of the evidence in the case that the defendant was negligent and that the plaintiff's injuries, if any, were directly caused by the defendant's negligence then your verdict should be for the plaintiff." Harke v. Haase, 335 Mo. 1104, 1111, 75 S.W.2d 1001, 1004.
We do not believe that it was the intention of the Supreme Court in suggesting the form of instruction in the Harke case, supra, to lay down a rigid and inflexible formula that must be followed word for word without the slightest deviation in all cases and that the omission of the one word "circumstantial" would constitute prejudicial error requiring a reversal of a judgment. The court was not trying to make the law dealing with the res ipsa loquitur doctrine more baffling, subtle and technical than it had been. On the contrary, the whole purpose of the opinion was to do away with the useless and confusing refinements that had grown up around said doctrine and to simplify instructions in such cases.
The instruction complained of in the case at bar did not tell the jury that they "should" or "must" find negligence. It simply told them that if they found the hypothesized facts, including the sudden jerk of the bus, to be true, then that would be sufficient evidence "to warrant" a finding that defendant was negligent and went on and declared "and you may so find, unless you find and believe from other facts in evidence," etc. We do not believe that the omission of the word "circumstantial" could have misled the jury in the slightest degree as to their duty. Although it would have been proper to follow literally the language suggested in the Harke case instruction, we nevertheless believe that the failure to label the evidence "circumstantial" did not, as we see it, prejudice any right of defendant. The instruction herein was similar in every respect to the one suggested by Judge Hyde in the Harke case except for the omission of the word "circumstantial." We think it would be carrying refinement of technicality to an extreme and absurd degree if we were to reverse this judgment because of the omission of that one word. We rule that the instruction was not erroneous.
Defendant next contends that the verdict for plaintiff was so grossly excessive as to demonstrate passion and prejudice on the part of the jury against defendant and that the judgment, even after remittitur, which reduced the amount to $6000.00, should not be permitted to stand.
*292 We have set forth herein fully the testimony of the doctors who testified for the respective parties and believe it would serve no useful purpose to repeat such testimony here. The question of determining the amount of damages to be allowed for personal injuries is primarily a matter within the province of the jury, and in determining whether the jury's verdict was grossly excessive, the appellate court must consider the evidence and inferences favorable to the verdict and disregard conflicting testimony. Furthermore, in measuring the money value of damages for personal injuries, each case must be judged on its own facts and consideration must be given to the economic conditions prevailing when the jury's verdict was returned. Also, due regard must be given to the maintenance of reasonable uniformity of awards for similar injuries. Henderson v. Dolas, Mo.Sup., 217 S.W.2d 554.
It is the settled law of this state that an appellate court should not interfere with the amount of a judgment for damages for personal injuries which has been allowed to stand by the trial court unless the amount is so grossly excessive or unmistakably beyond the bounds of reason as to be shocking to the judicial conscience. Hurst v. Chicago, B. & O. R. Co., 280 Mo. 566, 219 S.W. 566, 10 A.L.R. 174; Manley v. Wells, Mo.Sup., 292 S.W. 67; Johnson v. Terminal R. Association of St. Louis, 354 Mo. 800, 191 S.W.2d 676; Marshall v. St. Louis Union Trust Co., Mo.App., 196 S.W.2d 435.
Moreover, in determining whether or not the judgment for damages in this case as it now stands is excessive, the reduced purchasing power of the current dollar, of which we take judicial notice, must be considered. Petty v. Kansas City Public Service Co., 354 Mo. 823, 191 S.W.2d 653.
In October 1930, our Supreme Court in the case of Rockenstein v. Rogers, 326 Mo. 468, 31 S.W.2d 792, permitted a verdict and judgment for $10,000.00 to stand as damages in favor of a journeyman carpenter for injuries that were described as "painful and perhaps permanent." In the case at bar there was positive testimony that plaintiff had sustained a permanent and painful injury to her coccyx which, according to her doctor, will be progressive as to pain. Compared to the Rockenstein judgment above mentioned, the judgment herein for $6000.00 in this day of the reduced value of the dollar does not appear to be excessive.
In Mollman v. St. Louis Public Service Company et al., Mo.App., 192 S.W. 2d 618, this court permitted a judgment for $7000.00 to stand as proper damages to the plaintiff therein for a fracture of the last segment of the sacrum with slight forward displacement of the lower fragment which was accompanied with constant pain and a possibility of eliminating such pain only by surgical operation with some other minor injuries. The Mollman case was decided in 1946, when the cost of living was to a certain degree regulated and held down by the Government. It is, of course, common knowledge that since that time the cost of living has increased. In the case at bar there is evidence showing that plaintiff had a fracture of the "tail bone" or coccyx. She also had a displacement of the coccyx, and a tearing of the ligaments supporting it on one side. There was also testimony that it will require an operation to correct plaintiff's deviated coccyx to relieve her pain and that such an operation is a major surgical procedure which may or may not help plaintiff. This court said in the Mollman case, supra: "It is fundamental that the amount of damages to be awarded in a given case is a matter within the special province of the jury to determine, and is not to be interfered with by an appellate court unless the verdict is so large as to offend against all sense of right." Mollman v. St. Louis Public Service Co., Mo. App., 192 S.W.2d 618, 626. See also Marshall v. St. Louis Union Trust Company, supra, and Wilhelm v. Kansas City Public Service Company, 358 Mo. 6, 212 S.W.2d 915. We do not believe that the judgment can reasonably be said to be so large "as to offend against all sense of right."
Neither the verdict returned by the jury nor anything that occurred during the trial, *293 as we view the record, indicates in the slightest degree any bias or prejudice on the part of the jury against defendant. Defendant had its day in court and had its case tried before an experienced trial judge. Since we find no reversible error in the record, the judgment is affirmed.
ANDERSON, P. J., and HUGHES, J., concur.